# [J-97-2014]
## IN THE SUPREME COURT OF PENNSYLVANIA
### EASTERN DISTRICT

## CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, STEVENS, JJ.

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 15 EAP 2014 |
| | : |
| Appellant | : Appeal from the Judgment of the Superior |
| | : Court entered on 12/26/2013 at No. 2171 |
| | : EDA 2012 reversing the judgment of |
| v. | : sentence entered on 7/24/2012 in the |
| | : Court of Common Pleas, Criminal |
| | : Division, Philadelphia County at No. CP- |
| WILLIAM LYNN, | : 51-CR-0003530-2011 |
| | : |
| Appellee | : 83 A.3d 434 |
| | : |
| | : ARGUED:  November 18, 2014 |

## OPINION

**MR. JUSTICE BAER**                                         **DECIDED:  April 27, 2015**

Following a jury trial on charges that he endangered the welfare of children,[1] William Lynn (Appellee) was convicted and sentenced to a term of three to six years of incarceration.  On appeal from his judgment of sentence, he challenged the sufficiency of the evidence to sustain his conviction, contending that he had no direct supervision of the children he was found to have endangered.  The Superior Court agreed, and

---

[1]    18 Pa.C.S. § 4304(a) (1995) ("A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.").

reversed his conviction. On the Commonwealth's appeal, we reverse the Superior Court, concluding that there is no statutory requirement of direct supervision of children. Rather, that which is supervised is the child's welfare. Under the facts presented at trial, Appellee was a person supervising the welfare of many children because, as a high-ranking official in the Archdiocese of Philadelphia, he was specifically responsible for protecting children from sexually abusive priests.

Following eight years of education at St. Charles Borromeo Seminary in Wynnewood, Pennsylvania, Appellee graduated with a Bachelor's degree in Philosophy, and went on to earn two Master's degrees, in Divinity and Education Administration. Appellee was ordained as a priest in the Catholic Church on May 15, 1976. He served as a parish priest for eight years before becoming the Dean of Men at St. Charles Borromeo Seminary in 1984. In January 1991, Appellee was appointed Associate Vicar in the Office of the Vicar for Administration in the Archdiocese of Philadelphia. As Associate Vicar, one of Appellee's responsibilities was to assist Monsignor James Molloy by taking notes when they met with people regarding the sexual abuse of a minor by a member of the clergy, and, consequently, Appellee learned how to interview sexual abuse victims and record their allegations against a priest. N.T. 5/23/2012 at 183-85. In June 1992, Cardinal Anthony Bevilacqua appointed Appellee Secretary for Clergy for the Archdiocese of Philadelphia, where he served for twelve years, until June 2004.

As Secretary for Clergy, Appellee was responsible for ensuring that parishes were filled with enough priests, resolving disputes among priests, and handling clergy

sexual abuse issues.[2] N.T. 5/23/2012 at 74-75. Building upon the experience he acquired assisting Monsignor Molloy, Appellee learned how to handle the victims of clergy sex abuse and the priests who sexually abused minors, becoming the "point man" in the investigation into such allegations of clergy sexual abuse of minors within the Archdiocese of Philadelphia. N.T. 5/7/2012 at 246; 5/23/2012 at 173-202, 219-20. In this regard, it was his role to collect and assess information concerning allegations of sexual abuse against priests in the Archdiocese, discuss the allegations with the accused priests, participate in deciding how to address the allegations, and make

---

[2]    In a 2002 grand jury investigation, Appellee described his role as follows:

PROSECUTOR:    Can you briefly tell us what your duties are as the Secretary for Clergy?

APPELLEE:        The Cardinal or the Archbishop's delegate to the priests in all matters of their life, everything that happens, personnel assignments, personnel. Any personnel issues that come up with the priest, I handle those things.

PROSECUTOR:    Without oversimplifying it, would it be fair to say it's essentially like a human resource --

APPELLEE:        That's right

PROSECUTOR:    administrator in a way?

APPELLEE:        Right

PROSECUTOR:    Okay. Does your position also include investigating allegations of sexual abuse involving members of the Archdiocese?

APPELLEE:        It does, yes; priests.

Notes of Testimony (N.T.) 4/3/2012 at 259.

recommendations to the Cardinal about the priests against whom allegations were made.

Indeed, by his own account, Appellee was the sole "funnel" of information concerning instances of clergy sex abuse, and it was his office alone that was responsible for not only receiving the allegations and exploring them, but also for passing vital information about abusive priests and their young victims up the chain of command in the Archdiocese. N.T. 5/23/2012 at 201, 220. Although he could only independently remove a priest from a parish if that priest admitted that he had abused someone, N.T. 5/23/2012 at 77, it was Appellee's responsibility to make recommendations about assignments to the Cardinal, who had the ultimate decision making authority. For example, Appellee could make recommendations to place a priest on administrative leave or restrict a priest's ministry by, for instance, prohibiting contact with the public or with children. In this respect, Appellee characterized protecting children as the most important part of his job, and explained that he worked "for" the children of the Archdiocese. N.T. 5/24/2012 at 56.

Upon learning of an abusive priest, Appellee considered his first priority to be the welfare of the victim. N.T. 5/24/2012 at 115 ("I mean, of course, I always understood that the child victim would come first."); 5/23/2012 at 190-91 (when the prosecutor asked Appellee if there was "any job more important than protecting one of the innocent kids who was being sexually abused," Appellee answered in the negative). According to Appellee, the purpose of his investigations was, at least in part, to determine whether the offending priest "should be removed from ministry and taken out of the -- and children could be taken out of his way." N.T. 5/16/2012 at 98.

When Appellee first assumed the office of Secretary for Clergy in June 1992, he collected information about "problem priests" on a "need-be basis," whenever he received complaints about them. N.T. 5/7/2012 at 261. In addition, his position authorized him to be one of the few officials within the Archdiocese of Philadelphia with access to the "Secret Archives." The Secret Archives were located on the 12th floor of the Office of Clergy and maintained under lock and key; they contained information about "any kind of major infractions a priest would have," and which only a "very, very limited number of people within the Archdiocese had access to or a key to." N.T. 3/26/2012 at 213-14. The Secret Archives were largely in Appellee's control as Secretary for Clergy, and he routinely consulted them to determine if there was already information contained therein relevant to a priest about whom he had received complaints.

In early 1994, after receiving information about a particular priest, Rev. Dux, who was then in active ministry, Appellee consulted the Secret Archives and discovered documentation that this particular priest had engaged in serious sexual misconduct in the past. This discovery caused Appellee to become concerned that there were other priests in active service against whom allegations of abuse had been asserted, and accordingly prompted him to conduct a comprehensive review of the Secret Archives to check for incidents of child sexual abuse among all priests in active ministry within the Archdiocese of Philadelphia.

This review encompassed 323 priests and resulted in a report created by Appellee on February 18, 1994, entitled "Report from the Secretariat for Clergy" (referred hereafter as "February 18, 1994 Report"). This report identified 35 priests in

active service with previous complaints of sexual abuse of minors. Appellee placed each of these 35 priests on one of three lists: three priests were identified as "pedophiles;" 12 priests as "Guilty of Sexual Misconduct with Minors;" and 20 were included on a list entitled "Allegations of Sexual Misconduct with Minors with No Conclusive Evidence." N.T. 5/16/2012 at 182-98. Regarding the 12 priests that Appellee determined were guilty of sexual misconduct with minors, he considered it his job "to do something about [them]." N.T. 5/16/2012 at 47.

Reverend Edward V. Avery was the first name on Appellee's list of priests whom he considered to be guilty of sexual misconduct with minors.[3] Appellee was personally familiar with Rev. Avery, who had come to Appellee's attention about a year and a half earlier when he first became Secretary for Clergy, before he performed the comprehensive review of the Secret Archives. Appellee had investigated allegations into Rev. Avery's conduct, and memorialized his understanding of these allegations with notations to Rev. Avery's Secret Archives file indicating "alcoholism and action with same minor three times," and "action occurred more than five years ago." As will be discussed more fully below, the information contained in Rev. Avery's Secret Archives file revealed that he had built a trusting relationship with this minor, R.F., in his church, groomed R.F. with attention outside of the religious context, and, on several occasions, supplied R.F. with alcohol and engaged in inappropriate sexual conduct.

Specifically, Rev. Avery's Secret Archives file contained a letter written by R.F. on March 31, 1992, to Appellee's predecessor as Secretary for Clergy, Monsignor

---

[3] Because Appellee's knowledge of Rev. Avery's history of abuse was the basis of the Commonwealth's case against Appellee for endangering the welfare of children, these details are of paramount importance when considering this case.

Jagodzinski, regarding his sexual abuse by Rev. Avery in the 1970s when R.F. was an adolescent. R.F. indicated that he wrote the letter out of concern for "other adolescent boys" who may also have been abused by Rev. Avery. N.T. 4/25/2012 at 38. R.F. attached a copy of a letter he had previously written to Rev. Avery in which he recounted the bond that had been formed between them when R.F. was around 11 years old, in the sixth grade, and Rev. Avery was the assistant pastor at St. Philip Neri Parish in East Greenville, and how Rev. Avery's sexual groping of him on multiple occasions had wreaked emotional havoc upon him at a young age.[4] Allegedly because Monsignor Jagodzinski was in the process of ending his term, he had not responded to R.F.'s March 31, 1992 letter.

Once Appellee assumed the position of Secretary for Clergy, he reviewed R.F.'s letter, and, on September 28, 1992, met with him to discuss the allegations contained therein. R.F. provided further details regarding how Rev. Avery had victimized him at a young age. Specifically, when R.F. was an altar boy he helped Rev. Avery serve Mass at St. Philip Neri. He described Rev. Avery as very charismatic, popular with young people, and active with the youth in the parish. Outside of church, Rev. Avery gave R.F. his first beer at age 12, and took R.F. and other boys from the parish to his home in New Jersey, where he supplied them with alcohol. There was a loft in Rev. Avery's New Jersey home with several beds where the boys would sleep, and Rev. Avery would join the boys in the loft to wrestle with them. According to Appellee's notes of his

---

[4] R.F. further explained that he had put off writing the letter for years, because of the shame and fear he felt at confronting his abuse. N.T. 4/25/2012 at 38-39.

interview with R.F., during two or three such encounters, Rev. Avery's hand "slipped to [R.F.'s] crotch." N.T. 3/26/2012 at 255.

According to R.F., Rev. Avery continued this pattern of inviting him to participate in seemingly innocuous activities, and then groping him when vulnerable. By the time R.F. was 15 in 1978, Rev. Avery had been transferred from St. Philip Neri, but maintained contact with R.F. by telephone and invited him to parties where Rev. Avery was the disc jockey; a particular avocation of Rev. Avery's, and, notably, one that brought him into contact with multiple young men. Eventually R.F. began to assist Rev. Avery at parties. At a college party where R.F. helped Rev. Avery disc jockey, Rev. Avery supplied R.F. with alcohol, resulting in him becoming sick a few hours later, vomiting in the bathroom, and passing out in a hallway. Rev. Avery took R.F. back to the rectory where he resided, and encouraged R.F. to sleep in Rev. Avery's bed. When R.F. awoke several hours later, Rev. Avery's hands were inside R.F.'s shorts. In June 1981, when R.F. was 18, Rev. Avery invited him on a ski trip to Vermont. Rev. Avery, R.F., and his brother (J.F.) shared a hotel room. In the night, Rev. Avery joined R.F. in bed, and again molested him after he had fallen asleep, massaging his penis until it became erect and R.F. ejaculated.

The Secret Archives revealed that Rev. Avery had committed these offenses against R.F. after church officials had gone out of their way to accommodate Rev. Avery: when Rev. Avery was assistant pastor at Immaculate Heart of Mary Church in Chester, Pennsylvania, a church official had suggested in a memorandum to the Cardinal that Rev. Avery be appointed to St. Philip Neri to "avoid another breakdown" (the details of which are apparently unknown), which prompted Rev. Avery's gratitude to

the church official for accommodating his "euphemistically speaking, predicament." N.T. 3/26/2012 at 228. Rather than utilizing his transfer to St. Philip Neri as an opportunity to focus on his priestly obligations, however, Rev. Avery had instead engaged in the grooming behavior and sexual molestation of R.F. described above.

After revealing the details of his sexual abuse to Appellee, R.F. sought assurances that Rev. Avery would not be permitted to harm anyone else. Appellee assured R.F. that the Archdiocese's "order of priorities is the victim, the victim's family, the Church, and the priest himself." N.T. 3/26/2012 at 259-60. Appellee met with Rev. Avery a week later on October 7, 1992, regarding R.F.'s allegations. Although Rev. Avery initially denied R.F.'s account and expressed shock that R.F. was in counseling for this issue, Rev. Avery confirmed many of the details R.F. had provided, including that he took kids to his house in New Jersey and "would roughhouse with the boys . . .," and that he shared a bed with R.F. on the ski trip to Vermont, but stated that if he touched R.F. in the night, it was "accidental." N.T. 3/27/2012 at 10-11.

Regarding the incident after the college party in 1978, Rev. Avery claimed he had consumed too much alcohol to remember any details about that night, but admitted that it could be that something happened while he was intoxicated, and he did not remember. N.T. 3/26/2012 at 270. Appellee again spoke with Rev. Avery two days later by phone; Appellee's notes from this conversation do not include a denial, but reflected Rev. Avery's retort that R.F. "has a selective memory." N.T. 3/27/2012 at 5.

Following R.F.'s allegations and Rev. Avery's concession that the abuse could have happened, on October 16, 1992, Appellee informed Cardinal Bevilacqua of R.F.'s account, stated that Rev. Avery "expressed absolute denial," and informed the Cardinal

that R.F. did not mention legal action. On November 2, 1992, Appellee informed R.F. that Rev. Avery had denied his allegations. Appellee recommended to Cardinal Bevilacqua that Rev. Avery be sent to an Archdiocese-affiliated mental health treatment facility, the St. John Vianney Center in Downingtown,[5] for a four-day outpatient evaluation beginning November 30, 1992.

The Cardinal accepted the recommendation, and Rev. Avery went to St. John Vianney. As part of the evaluation process for Rev. Avery, Appellee had to complete a referral form intended to detail the background of issues important to Rev. Avery's assessment. Despite this request for details, Appellee did not include any information about Rev. Avery touching R.F. while wrestling, placing his hands inside R.F.'s shorts, massaging R.F.'s penis during the trip to Vermont, and did not mention that Rev. Avery conceded "it could be" that something happened. Rather, Appellee merely indicated there were allegations against Rev. Avery by an adult male about events that occurred when the man was in his teenage years, and focused on the fact that Rev. Avery had supplied alcohol to minors.

Even with such an incomplete picture of Rev. Avery's background, the staff at St. John Vianney recommended inpatient hospitalization, a recommendation which Cardinal Bevilacqua again accepted, and Rev. Avery was admitted for long term

---

[5] The St. John Vianney Center is a mental health treatment facility operated by the Archdiocese; Appellee sat on the Board of Directors there, at the request of Cardinal Bevilacqua. Moreover, according to a detective who investigated clergy sex abuse in the Archdiocese, St. John Vianney was where the Archdiocese routinely sent priests who "had problems dealing, basically, sexually abusing minors, alcohol treatment programs, psychological problems. The center itself was owned and operated by the Archdiocese, and they would send priests with problems to the center to be evaluated." Tr. Ct. Op. at 10, n.17.

treatment on February 18, 1993. Less than three weeks later, on March 11, 1993, Appellee responded to a parishioner who had written about "unfavorable" calls that had been made regarding Rev. Avery by affirmatively misrepresenting that there had "never been anything but compliments heard in this office about Father Avery. . . ." N.T. 3/27/2012 at 38.

About six months after he was admitted to St. John Vianney, Rev. Avery's primary therapist, Wayne Pellegrini, Ph.D., reported to Appellee that Rev. Avery was ashamed and "acknowledged that the incident [with R.F.] must have happened . . . ." N.T. 3/27/2012 at 42. Additionally, Dr. Pellegrini informed Appellee that "there remains [sic] concerns about the existence of other victims," and, based on Rev. Avery's failure to accept fully his own responsibility, continued treatment was strongly recommended "to prevent further acting out." Id.

On September 28, 1993, Appellee received Dr. Pellegrini's treatment plan for Rev. Avery's October 1993 release from St. John Vianney, which provided that Rev. Avery was not diagnosed with a sexual disorder for two reasons: "there is only one report of abuse," and Rev. Avery "had been drinking during those incidents. . . ." N.T. 3/27/2012 at 48. Nevertheless, Dr. Pellegrini recommended that Rev. Avery continue to receive outpatient treatment and an assignment where he would not be around children:

> The treatment team's recommendations for [Rev. Avery] post discharge . . . include: One, continued outpatient treatment. Two, an aftercare integration team, ministry supervision. Three, a ministry excluding adolescents and with a population other than vulnerable minorities [sic] with whom [Rev. Avery] tends to overidentify with [sic]. Four, attendance at a 12-step [Alcoholics Anonymous] meeting for priests.

N.T. 3/27/2012 at 48.

Despite Rev. Avery's admission to Appellee that "it could be" that what R.F. alleged really happened, his admission to the staff at St. John Vianney that his abuse of R.F. "must have happened," Dr. Pellegrini's concern about the existence of other victims, and the recommendation of the treatment team at St. John Vianney that Rev. Avery be kept away from minors, Appellee's first recommendation for Rev. Avery's post-discharge assignment was as associate pastor at Our Lady of Ransom in Philadelphia, a parish with a grade school. N.T. 3/27/2012 at 52. Appellee made this recommendation, at least in part, because Rev. Avery had not been diagnosed as a pedophile. Appellee later admitted on cross-examination that the lack of a pedophilia diagnosis is a poor indicator of whether an individual will engage in acts of pedophilia. N.T. 5/23/2012 at 218-19 (acknowledging that "I've seen where a person is not diagnosed as a pedophile and yet has engaged in acts of pedophilia.").

Cardinal Bevilacqua rejected Appellee's recommendation for Rev. Avery's placement for unknown reasons, suggesting instead that Rev. Avery be placed in a chaplaincy assignment. On November 22, 1993, Appellee recommended an assignment for Rev. Avery as Chaplain at Nazareth Hospital in Philadelphia, which would have provided housing for Rev. Avery on site. Pursuant to Rev. Avery's request, however, and despite Dr. Pellegrini's warning against placing him in a position that would give him access to minors, Appellee petitioned the Cardinal to permit Rev. Avery to live in a nearby rectory at St. Jerome's Church, which had a grade school attached. The Cardinal accepted this recommendation. Rev. Avery's placement was effective December 13, 1993, less than three months before Appellee placed Rev. Avery's name atop his list of "Priests Guilty of Sexual Misconduct with Minors," demonstrating his

belief that R.F.'s allegations were credible. Despite his conclusion in this regard, Appellee never shared his belief that Rev. Avery was guilty of sexual misconduct with minors or Rev. Avery's admissions with anyone, while housing him where he had access to grade school children.

With the exception of St. Jerome's pastor, Father Joseph Graham, Appellee did not notify any of the priests who lived in St. Jerome's rectory about any of Rev. Avery's past conduct. Although Appellee informed Father Graham that Rev. Avery was not to be around children, he did not explain this directive, and he also informed Father Graham that he had asked Rev. Avery to offer assistance in the parish. Accordingly, Rev. Avery assisted the parish by celebrating Mass and helping with children's confessions on occasion. N.T. 5/29/2012, 107-08. Although Father Graham was allegedly assigned to help monitor Rev. Avery, he later testified that he was unaware of Rev. Avery's aftercare treatment plan, and he did not consider himself Rev. Avery's supervisor.

In the first year following his discharge from St. John Vianney, Rev. Avery met with a psychologist weekly, who notified Appellee on at least two occasions that Rev. Avery's aftercare integration team, which was to include Appellee, Father Graham, another priest, and his outpatient care providers from St. John Vianney, was initially slow to organize and met only sporadically thereafter. In November 1994, Appellee learned from Father Graham that Rev. Avery was again disc jockeying at weddings and parties. In December 1994, during a meeting of Rev. Avery and his aftercare integration team, Appellee instructed him to focus on his chaplaincy and his recovery, and stated that he should not be working as a disc jockey.

In February 1995, Appellee learned from another chaplain at Nazareth Hospital, Father Kerper, that Rev. Avery had disregarded this direction, continued to accept outside commitments, and had arranged for substitutes to cover his work at Nazareth Hospital on 25 of 31 Saturdays because of his disc jockeying priorities, one of which was at a dance at St. Jerome's Parish. Appellee's subsequent testimony revealed his knowledge that this was a grade school dance. N.T. 5/29/2012 at 122-23. Also around this time, Appellee learned that Rev. Avery's psychologist had agreed, at his request, to decrease the frequency of his sessions.

In September 1995, Appellee received a complaint from Father Kerper about Rev. Avery's activities as a disc jockey, stating that Rev. Avery had booked three events in one weekend and was soliciting new engagements, shirking his chaplaincy responsibilities within the hospital. N.T. 3/27/2012 at 75. Appellee brushed these concerns aside and instructed Father Kerper, who did not know that there were allegations of sexual misconduct against Rev. Avery, to take his concerns about Rev. Avery to his supervisor at Nazareth Hospital instead of the Secretary for Clergy.

In September 1996, Appellee again ignored R.F.'s attempts to ensure that other children were safe from Rev. Avery, choosing not to respond when R.F. requested by email that the diocese vouch for the safety of its children. Nor was there any indication in the Secret Archives or elsewhere that Appellee followed up on R.F.'s concern, or that of the staff at St. John Vianney, inquiring as to whether Rev. Avery was cultivating or, indeed, exploiting new victims from among the children he came into regular contact with at St. Jerome's parish, its grade school, or through the many parties and dances where he served as disc jockey.

Despite Rev. Avery's past transgressions, complaints that he was neglecting his work obligations, and information that he was instead again focusing on disc jockeying, an activity he had utilized in the past to put him in contact with minors, when Rev. Avery requested assistance to advance his career, Appellee was willing to help. In August 1997, Appellee assisted in the preparation of a letter to the National Association of Catholic Chaplains which stated that Rev. Avery was "a priest in good standing" and "has given exemplary service these past four years" as Chaplain at Nazareth Hospital.

On September 5, 1997, Appellee wrote to Cardinal Bevilacqua requesting a letter of recommendation for Rev. Avery to pursue a Doctorate of Ministry in Spirituality from the Lutheran Theological Seminary in Philadelphia. Appellee was permitted to write the letter of recommendation himself, as the Cardinal's delegate, which he did, describing Rev. Avery as a "very sincere, hard working priest. He is honest and trustworthy. He is a man who is in touch with his spiritual life and this becomes evident in his work and service." N.T. 3/27/2012 at 85-86. Despite describing Rev. Avery as trustworthy, he told Rev. Avery that "in the future he should play things low-key," and that he should be "more low-key than he has been recently." Id. at 88-89.

Consistent with Dr. Pellegrini's 1993 warning to Appellee that Rev. Avery failed to accept responsibility for his actions, indicating the potential for "further acting out," N.T. 3/27/2012 at 42, an April 2, 1998 meeting between Appellee and Rev. Avery left Appellee with the impression (recorded in the Secret Archives) that Rev. Avery was again minimizing his need for treatment and "the allegations against him." During this meeting, Appellee informed Rev. Avery that he would be unable to recommend him to

another diocese, because that would require the completion of a form stating that the priest had no allegations against him.  Id. at 90-91.

Several months later, in the fall of 1998, D.G., a ten-year-old boy in approximately fifth grade, began training to serve Mass as an altar boy at St. Jerome's. When he became an altar boy shortly thereafter, he served Mass with the priests of St. Jerome's: Father Graham, Father McBride, Father Englehardt, and Rev. Avery.  Neither D.G. nor his parents, nor anyone in the parish, knew either that Appellee had determined nearly four years before that Rev. Avery was guilty of sexual misconduct with a minor (R.F.) or his extensive and troubled history as recounted herein.

From around December 1998 through January 1999, Father Englehardt began sexually abusing D.G. after Mass, during what Father Englehardt referred to as "sessions."  In early 1999, Rev. Avery encountered D.G. inside the church after school on a Friday afternoon.  Rev. Avery pulled D.G. aside, informed the boy that he had heard about his "sessions" with Father Englehardt, and stated that "ours were going to begin soon."  N.T. 4/25/2012 at 126-27.  A week later, after D.G. served weekend Mass with Rev. Avery, he asked D.G. to stay because their "sessions" were about to begin. After everyone else left, Rev. Avery took D.G. to the sacristy, where he made the boy do a "striptease" to music.  Id. at 131.   While telling the boy "[t]his is what God wants," Rev. Avery fondled D.G.'s penis with his hands, performed oral sex on him, and penetrated the boy's anus with his finger.  Id. at 132-33.  Rev. Avery instructed D.G. to perform oral sex on him until he ejaculated on the boy's neck and chest.  Id. at 134-35. About two weeks later, Rev. Avery abused D.G. again in a similar fashion, this time also licking his anus.  Rev. Avery told D.G. that he did a good job, God loved him, and they

would be seeing each other again soon.  Id.  D.G., however, successfully found ways to avoid Rev. Avery and therefore to avoid further abuse by him.  Nevertheless, the effect of this abuse was devastating: by the time D.G. was approximately 11 years old, he became withdrawn and began using drugs, which developed into a heroin addiction by age 17.  Id. at 146.[6]

In 2002, following the eruption of the child sex abuse scandal in the Archdiocese of Boston, the leaders of the Catholic Church met in Dallas and produced the Dallas Charter for the Protection of Children and Young People of the United States Conference of Catholic Bishops (Dallas Charter), which established protocols for the Catholic Church with regard to child sex abuse.  Among other things, the Charter required each diocese to establish an Archdiocesan Review Board (Review Board) to evaluate and act upon allegations of clergy sex abuse and eliminated the possibility of merely restricting a priest's ministry.  Tr. Ct. Op. at 18-19.[7]

Shortly following the Dallas Charter, on June 20, 2002, R.F.'s brother, J.F., called Appellee and detailed how he too was fondled by Rev. Avery when he was 14 or 15

---

[6]    Rev. Avery's abuse of D.G. was not reported until January 30, 2009, when D.G. was 21 years of age and Appellee was no longer Secretary for Clergy.

[7]    Although the Dallas Charter marked a turning point for the Catholic Church's response to allegations of clergy sex abuse, canonical law, specifically, Number 8 of the Essential Norms, had always prohibited such abuse as follows:

When even a single act of sexual abuse by a priest or deacon is admitted or is established after an appropriate process in accord with canon law, the offending priest or deacon will be removed permanently from ecclesiastical ministry, not excluding dismissal from the clerical state, if the case so warrants.

N.T. 4/12/2012 at 115-16.

years old, in the late 1970s. He explained that Rev. Avery had driven a van of several children to his house in New Jersey where he supplied them with alcohol. J.F. stated that Rev. Avery was "jumping on each kid. . . . tickling me. . . felt like he was going to grab me." N.T. 3/27/2012 at 96. J.F. additionally informed Appellee that Rev. Avery had been seen in the recent weeks of 2002 disc jockeying at parties.

On June 2, 2003, in accord with the procedure established by the Dallas Charter, Appellee initiated a "preliminary investigation" into the accusations made against Rev. Avery "on or about September 28, 1992, which resurfaced on or around June 19, 2002." N.T. 3/27/2012 at 101. On September 27, 2003, the Review Board found Rev. Avery in violation of the Essential Norms defining sexual abuse of a minor and concluded that he should be removed from active ministry and rectory living, "or any other living situation in which he would have unrestrained access to children now or in the future." N.T. 3/27/2012 at 102-03.

On December 5, 2003, Cardinal Justin Rigali, Cardinal Bevilacqua's successor,[8] signed a decree excluding Rev. Avery from ministry, living in any ecclesiastical residence without prior permission, celebrating public Mass, or administering the sacraments. On June 20, 2005, Cardinal Rigali requested that Rev. Avery be laicized,[9] and on January 20, 2006, Pope Benedict XVI granted him dispensation from all priestly obligations. In January 2009, D.G. contacted the Archdiocese to make his allegations

---

[8]     Upon Cardinal Bevilacqua's retirement in 2003, he was replaced by Cardinal Rigali. Cardinal Bevilacqua died in 2012.

[9]     As the trial court explained, laicization is the process which takes from a priest or other cleric the use of his powers, rights, and authority. Tr. Ct. Op. at 19-20.

against Rev. Avery, leading to criminal charges against, *inter alia,* Appellee, as further described below.

Towards of the end of Appellee's tenure as Secretary for Clergy, the Philadelphia District Attorney began to investigate the Archdiocese of Philadelphia for clergy sex abuse. In 2002, a grand jury was empanelled at the request of the District Attorney to investigate the Archdiocese's treatment of allegations of such abuse. On May 24, 2002, the grand jury subpoenaed documents from Appellee pertaining to priests accused of sexual abuse, and Appellee and other Archdiocese officials were summoned to testify repeatedly. In 2005, the grand jury issued a report detailing the sexual abuse of minors in the Archdiocese of Philadelphia. In RE: County Investigating Grand Jury of September 17, 2003 (2005) (hereafter, the 2005 Grand Jury Report). The report concluded that the statute that criminalized endangering the welfare of a child (EWOC), 18 Pa.C.S. § 4304 (1995), as it existed, at that time, was written in a manner that allowed church officials such as Appellee to escape criminal liability. The version of the EWOC statute under consideration by the grand jury and under which Appellee was ultimately charged provided as follows:

> (A) OFFENSE DEFINED: A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.
>
> (B) GRADING: An offense under this section constitutes a misdemeanor of the first degree. However, where there is a course of conduct of endangering the welfare of a child, the offense constitutes a felony of the third degree.

18 Pa.C.S. § 4304 (1995).

Examining the language of Section 4304(A), the grand jury concluded as follows:

> As defined under the law, . . . the offense of endangering the welfare is too narrow to support a successful prosecution of the decision-makers who were running the Archdiocese. The statute confines its coverage to parents, guardians, and other persons "supervising the welfare of a child." High level Archdiocesan officials, however, were far removed from any direct contact with children.

See Commonwealth v. Lynn, 83 A.3d 434, 445 n.15 (Pa.Super. 2013).

Based on its construction of Section 4304(A), the grand jury did not recommend any criminal charges, but instead recommended amending the statute with language to expand the reach of the provision to encompass conduct by individuals in an employer or supervising capacity. The Philadelphia District Attorney's Office decided not to bring charges against Appellee. According to Appellee, following this recommendation, legislators, the Philadelphia District Attorney's Office, and others advocated for a change in the law throughout Pennsylvania. In 2006, the legislature obliged, and amended the EWOC statute, effective January 27, 2007, to read:

> A parent, guardian, or other person supervising the welfare of a child under 18 years of age, *or a person who employs or supervises such a person,* commits an offense if he knowingly endangers the welfare of a child by violating a duty of care, protection or support.

18 Pa.C.S. § 4304(a)(1) (2007) (emphasis added).

Notwithstanding the grand jury's failure to recommend criminal charges and the prior Philadelphia District Attorney's decision not to prosecute based on the belief that the 1995 EWOC statute could not reach the conduct of church officials in a supervisory capacity, the Commonwealth changed course, and in 2011 charged Appellee with two counts of EWOC pursuant to the 1995 version of the statute because the criminal course of conduct in which Appellee was alleged to have engaged occurred from 1992-

2004 while he was Secretary for Clergy.[10]  In addition, the Commonwealth charged Appellee with two counts of conspiracy to commit EWOC, 18 Pa.C.S. § 903,[11] relating to his supervision of Rev. Avery and another priest, Rev. Brennan.  Appellee was initially going to be tried together with both Rev. Avey and Rev. Brennan.  Rev. Avery, however, pled guilty to involuntary deviate sexual intercourse and conspiring to endanger the welfare of children on March 22, 2012, after the jury had been selected, but before trial began.[12]  The trial, therefore, continued with Appellee and Rev. Brennan.

Appellee sought to quash the charges of EWOC on the basis that he had "no connection whatsoever" to the children whose welfare he was accused of having endangered.  Tr. Ct. Op. at 180.  Once this motion was denied, Appellee moved for extraordinary relief in this Court pursuant to 42 Pa.C.S. §§ 726 and 502, arguing that

---

[10]     Unless otherwise noted, therefore, all references to EWOC and Section 4304 will be to the 1995 version.

[11]     Conspiracy is defined as follows:

(a) Definition of conspiracy.--A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903(a).

[12]     See 18 Pa.C.S. §§ 3123(a) and 903(c), respectively.

the version of the EWOC statute applicable to him did "not cover Archdiocese managers who did not directly supervise children." Tr. Ct. Op. at 180. We denied Appellee's petition on February 12, 2012.

Appellee's and Rev. Brennan's jury trial commenced on March 26, 2012. The Commonwealth sought to prove that Appellee had engaged in a pattern of concealment and facilitation of child sexual molestation by abusive priests, conduct which led directly to Rev. Avery's abuse of D.G. The Commonwealth introduced extensive evidence that Appellee's handling of Rev. Avery's case was not an anomaly, but was in accord with his established practice for dealing with sexually abusive priests. The evidence demonstrated that Appellee violated his duty to prevent priests from sexually molesting children in order to protect their reputations in furtherance of his objective to conceal the misconduct and to protect instead the reputation of the Archdiocese.

In addition to the conduct and abuse committed by Rev. Avery, the Commonwealth sought to introduce "other acts evidence" pursuant to Rule 404(b)(2) of the Rules of Evidence,[13] arguing that to understand Appellee's intent, knowledge,

---

[13]  Rule 404(b) in relevant part provides as follows:

> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b).

motivation, and absence of mistake when handling Rev. Avery's case, it was necessary for the jury to hear how he personally handled other cases involving sexual abuse allegations against priests and the knowledge he acquired from reviewing the Secret Archives. The Commonwealth specifically alleged that evidence in the files of other priests revealed that Appellee routinely failed to act in his supervisory capacity to protect the welfare of children when faced with reports of priests who were raping, molesting, and acting immorally with these children, repeatedly made transfers to facilities where clergy could continue abusing children when trouble arose, and permitted abusing priests to continue in the ministry while keeping parents and law enforcement ignorant of the peril. Tr. Ct. Op. at 21.

Specifically, the Commonwealth sought to present evidence concerning Appellee's knowledge of abusive behavior by 27 priests in addition to Rev. Avery and his reaction to this knowledge. The trial court permitted the Commonwealth to introduce evidence pertaining to 20 priests pursuant to Rule 404(b)(2), agreeing with the Commonwealth that the evidence would assist the jury in evaluating whether Appellee was aware of the danger presented by priests who had abused children in the past; whether he knowingly disregarded that risk; whether Appellee knowingly put D.G. and other unnamed minors to whom Rev. Avery had access in jeopardy; and whether Appellee intended to permit sexually abusive priests to operate within the Archdiocese without supervision. The trial court has thoroughly recounted the prior bad acts evidence in its opinion. For ease of discussion, what follows is a brief description of the prior bad acts evidence pertaining to several of the abusive priests whom Appellee managed, as demonstrative of the cumulative prior bad acts evidence, which is relevant

to our legal analysis of Appellee's role as a supervisor of the welfare of children in his capacity as Secretary for Clergy, and our application of the law to the facts presented at trial.

In particular, the Commonwealth introduced evidence that on July 18, 1991, while Appellee served as Associate Vicar in the Office of the Vicar for Administration assisting Monsignor Molloy in looking into allegations of sexual abuse, Appellee learned that two county detectives were investigating Father Michael Bolesta concerning allegations made by the parents of several teenage boys that Father Bolesta had inappropriately touched the boys on several occasions. The pastor of the church where Father Bolesta was a parochial vicar informed the detectives that he had questioned one of the boys, who stated that Father Bolesta had inappropriately touched him and invited the child to go swimming naked. Additionally, about seven months previously, the parents of another boy complained to the pastor of similar conduct. The pastor sought direction from the Archdiocese, and Appellee's predecessor noted in the Secret Archives file that because charges had not been filed, the parents of these boys would likely drop the matter if the Church acted on it.

On July 20, 1991, Appellee and Monsignor Molloy interviewed one of Father Bolesta's victims and learned not only of the priest's inappropriate conduct and touching, but also the names of nine other possible victims. Appellee assisted the Monsignor in interviewing the families of these boys, and learned that Father Bolesta repeated the same *modus operandi*: inappropriate touching, swimming naked with the boys, groping, and showering together. During interviews with the victims and their families, Appellee repeatedly faced not only the rage, anger, and disgust directed at

Father Bolesta, but the concern that the abusing priest should never be around children again. Appellee met with Father Bolesta on August 5, 1991, and he denied the allegations. Appellee, however, shielded Father Bolesta from the families' emotions, instead indicating to him only that the families and the victims were concerned for the priest and appreciated the good work he had done.[14]

Despite the numerous accusations and consistent details, Appellee accepted Father Bolesta's denials and suggested that he may have just been fatigued: "[Appellee] stated that perhaps even though there was no action committed, perhaps the behavior has to be examined especially because of the stress and tiredness Father Bolesta said he was experiencing." N.T. 4/18/2012 at 134-37.[15] Appellee and the Monsignor asked Father Bolesta to receive counseling and stated that his parishioners would be told that Father Bolesta had other commitments that prevented him from serving at such a busy parish.[16]

---

[14]    Appellee shielded another priest, Father Albert T. Kostelnick, from allegations of sexual abuse entirely by failing to inform the priest that several young girls alleged they had been fondled by him. Following the allegations, the Archdiocese transferred Father Kostelnick to a parish with a grade school.

[15]    This was not the only time Appellee suggested explanations for sexual misconduct. On another occasion, when a man came forward with accusations of inappropriate contact with Father Thomas J. Smith when he was 12 years old, Appellee proposed to the accused priest that perhaps the incident occurred in a manner that differed from the accuser's recollection, and that the 12-year-old boy had misconstrued what occurred. When another priest, Father Thomas F. Shea, admitted to sexually abusing an adolescent boy, Appellee suggested to the priest that perhaps the boy had seduced him.

[16]    Similarly, when another priest, Father Thomas Wisniewski, stood accused of sexually abusing a 15-year-old boy and reported for inpatient mental health treatment, Appellee instructed him to tell his parishioners he was going on vacation.

Following Father Bolesta's removal from his parish, he was evaluated and diagnosed with an unspecified sexual disorder, and his treatment team recommended that he be enjoined from one-on-one contact with minors and be reevaluated a year later. Several months later, his counselor repeated that he should not be around minors.[17] Following his reevaluation in October 1992, the treatment team stated that he had not shown the improvement they had hoped for; however, because of his cooperation with the treatment plan they saw no need for continued restrictions on his ministry.

When the families who had raised allegations against Father Bolesta learned of his reassignment, they expressed deep resentment and anger to Rev. Thomas O'Brien, whom the Church had tasked with meeting with them. Although Rev. O'Brien assured the families that the Archdiocese did not intend to cover up Father Bolesta's conduct by reassigning him, he conveyed to Appellee that the Church should be more discreet when reassigning priests against whom allegations of sexual abuse had been made, because it was the Church's publishing of the reassignment that prompted the resurfacing of the families' anger and concern, a suggestion for which Appellee thanked him.

On November 4, 1992, Appellee responded to a parishioner who was concerned that Father Bolesta's reassignment was due to allegations of sexual abuse at his prior position by stating that the parishioner was "not in possession of the proper facts and

---

[17] Notwithstanding this recommendation, Cardinal Bevilacqua appointed Father Bolesta as an associate pastor at St. Agatha-St. James in Philadelphia with no restriction on his ministry, effective June 15, 1992.

information."[18]  In the February 18, 1994 Report, Father Bolesta was the first name Appellee included under the heading "Allegations of Sexual Misconduct with Minors with No Conclusive Evidence."

Turning to the other acts evidence regarding Father Nicholas Cudemo, there were several incidents alleged in his Secret Archives file prior to Appellee's appointment as Secretary for Clergy: a 1966 allegation that Father Cudemo had been in a three-year sexually abusive relationship with a teenage girl; a 1969 allegation by an assistant pastor that Father Cudemo had been seen trying to calm a hysterical girl in the high school, who loudly shouted that she loved him; about a month later the same pastor reported that Father Cudemo had taken a different young woman into his room and closed the door; in 1977, a recent high school graduate revealed that her best friend had been involved in a sexually abusive relationship with the Father for a couple of years and may have become pregnant.

---

[18]  Appellee routinely misled individuals who were concerned about priests with sexual abuse allegations against them.  For instance, in May 1993, colleagues of Father David C. Sicoli witnessed disturbing behavior and voiced their concern to Appellee about Father Sicoli developing a consuming and odd relationship with a young teenage boy.  Despite allegations dating back to 1977 about Father Sicoli, Appellee responded to his concerned colleagues that Father Sicoli had "no other problems before."  N.T. 5/1/2012 at 214. Shortly thereafter, two pastors met with Appellee to protest against Father Sicoli's continued behavior and threatening to resign if he was not removed. Appellee recommended the transfer of one of the complaining pastors, N.T. 4/26/2012 at 179, and the other voluntarily left the parish, N.T. 5/1/2012 at 219.

As to Father Robert Brennan, who had been through treatment at St. John Vianney and transferred to another parish following allegations of sexual misconduct, Appellee informed concerned colleagues that Father Brennan's treatment and transfer were because of "boundary issues," and that there were no allegations of sexual misconduct.  N.T. 5/14/2012 at 71.

On September 25, 1991, Appellee met with three other women, each of whom provided details of sexual abuse by Father Cudemo. Two stated that the abuse began when they were 15 years old, and another indicated it started around age ten. When one of the women asked if there were other allegations of abuse, Monsignor Molloy stated that there had been nothing of that nature, although in fact several months before the September 1991 meeting, another woman had contacted the Archdiocese to state that she and Father Cudemo had been in a sexually abusive relationship for 15 years, beginning when she was 16 years old.

When Appellee confronted Father Cudemo with these accusations, he initially reacted by disclaiming responsibility and stating that individuals were "out to get" him. N.T. 5/3/2012 at 98-99. When asked about specific details, however, Father Cudemo conceded that "possibly" they were accurate. In October 1991, yet another woman came forward with similar allegations, and, in November 1991, several victims wrote to the Archdiocese to characterize the Church's failure to remove Father Cudemo as "immoral and negligent" and threatened to bring a lawsuit. Id. at 144-45. Within a week of receiving the letter, Appellee and Monsignor Molloy met with Father Cudemo to ask him to withdraw from the parish. Father Cudemo resisted, and similarly resisted treatment. When he was directed to be hospitalized for evaluation and treatment, he refused. From February 1992 through December 1994, Appellee repeatedly instructed Father Cudemo to comply, to no avail. In February 1994, Appellee placed Father Cudemo's name on the list of "Diagnosed Pedophile" priests, but permitted him to continue to operate in active ministry.

In May 1996, Father Cudemo resigned as pastor at St. Callistus Parish in Philadelphia, and his clinical psychologist, who was not part of the Archdiocese ordered treatment, wrote to Appellee to provide his opinion that Father Cudemo is not a pedophile and was not a danger to anyone. Cardinal Bevilacqua permitted Father Cudemo to retire as a priest in good standing. Notwithstanding his inclusion on a list of pedophile priests, in February 1997, Appellee encouraged Father Cudemo to participate as a retired priest in the Archdiocese of Philadelphia.

In January 2001, a Philadelphia Police Officer called Appellee concerning allegations made against Father Cudemo by a former student at St. Irenaeus School in Philadelphia, who alleged sexual abuse while she was in the fifth through seventh grades. The police officer requested any information Appellee had about allegations arising from Father Cudemo's time at St. Irenaeus. Instead of informing the officer of the extensive allegations of sexual abuse made by multiple other girls as recounted above, or that he considered Father Cudemo to be a pedophile, Appellee stated that there were none.

The Commonwealth also introduced other acts evidence in relation to Father Stanley Gana. In 1991, Appellee began investigating allegations of sexual abuse of a minor boy, R.K., by Father Gana, which was alleged to have occurred over a period of several years, three to four times a week, beginning when R.K. was 13, and eventually involving anal penetration. R.K. informed Appellee in April of 1992 of two other boys who had similar experiences with Father Gana. On May 26, 1992, Appellee met with Father Gana concerning R.K.'s accusations; Father Gana denied them, explaining that perhaps R.K. misunderstood signs of affection. Cardinal Bevilacqua accepted Father

Gana's explanations, determining the investigation into R.K.'s accusations to be inconclusive. On February 18, 1994, Appellee placed Father Gana's name on his list of priests alleged to have had sexual misconduct with minors "with no conclusive evidence." N.T. 5/16/2012 at 185.

In early September 1995, M.B., one of the victims identified by R.K. to Appellee, contacted the Archdiocese and told Appellee that Father Gana had abused him beginning when he was 11 years old in 1978 and continuing beyond high school graduation. He stated the abuse involved anal sex once or twice a week when he was a freshman in high school, and that he was part of a "rotation" of boys with whom Father Gana shared a bed and had sex. M.B. told Appellee that he desired to take out a full-page advertisement identifying Father Gana as a pedophile and inviting other victims to come forward; Appellee told him that was not possible, as it would infringe on Father Gana's rights.

Appellee confronted Father Gana with M.B.'s allegations on September 5, 1995, and Father Gana denied all allegations of wrongdoing. He did, however, admit that he shared a bed with the boys, but that it was their choice to do so. Appellee suggested Father Gana report to St. John Vianney for a psychological evaluation, which resulted in several diagnoses, including a sexual disorder not otherwise specified. The staff at St. John Vianney recommended further treatment and considered Father Gana to be at risk for further "inappropriate and dangerous behavior." N.T. 4/3/2012 at 23-24. Father Gana resigned from his assignment, purportedly for health reasons, less than a week later, and Appellee helped to arrange inpatient treatment for him at a Church-affiliated treatment facility, Southdown, in Ontario.

In February 1996, the director of clinical services at Southdown, Sister Donna Markham, confronted Father Gana about the accusations against him, and he admitted they were all true. Even though the accusations were that he raped multiple boys under the age of 14, Sister Markham declined to diagnose him with pedophilia, stating rather that he was a person who acted under the influence of drugs or alcohol. Less than a month into his four-to-six week inpatient stay, Father Gana checked himself out of Southdown and moved to Florida. Less than ten days later, Sister Lucy Vasquez, the Chancellor of the Diocese of Orlando, Florida, spoke to Rev. Michael T. McCulken, Assistant Director in the Office for Clergy in the Archdiocese of Philadelphia, to report that some of her parishioners had expressed concern "about what might be happening at [Father Gana's] house" in Orlando, where a number of young people from Slovakia were staying. N.T. 4/3/2012 at 44.

In early June 1996, M.B. followed up with Appellee, questioning the lack of communication. Although Sister Markham had told Appellee that Father Gana had admitted the truth of the accusations, Appellee informed M.B. that Father Gana continued to deny them but had agreed to a psychological evaluation. By the time Appellee informed M.B. that Father Gana agreed to the evaluation, he had already quit his inpatient treatment and moved to Orlando.

Appellee wrote to Father Gana shortly after speaking with M.B. and expressed concern that he had quit treatment, which, he later explained to a grand jury, was out of concern for possible future victims of abuse. In September and October 1996, Father Gana expressed interest in completing treatment and returning to active ministry, which Appellee said was possible because of the lack of a diagnosis of pedophilia. However,

he warned Father Gana of the danger that M.B. would take his accusations to the press. Father Gana returned for treatment at Southdown and admitted to having sexual contact with eight individuals in the 1970s and 1980s, three of whom were adolescents, including R.K. and M.B. Southdown staff informed Appellee that Father Gana claimed to have been chaste for ten years; Appellee recommended to Cardinal Bevilacqua that Father Gana be permitted to return to a limited form of ministry to keep him from the public eye, specifically recommending him as a chaplain to the Carmelite Ministry in Philadelphia. The Cardinal approved Appellee's recommendation. Two Mother Superiors were informed Father Gana would be joining them; they were not, however, informed that he had been accused of sexually abusing minors.

Five years later, Appellee informed Father Gana of a change in Church policy that would no longer permit priests who had sexually abused minors, even absent a declaration of pedophilia, to operate in limited ministry. Father Gana was relieved of his assignment effective February 2002.

Finally, for our purposes, information in the Secret Archives regarding Father Edward DePaoli indicated that he had pled guilty in federal court to receiving child pornography in the mail. While serving one year of probation for this offense, on June 26, 1985, he was admitted to St. John Vianney for an evaluation and treatment, where he was diagnosed with an unspecified sexual disorder. The Archdiocese of Philadelphia arranged for Father DePaoli to transfer to a New Jersey diocese, where he served for nearly three years, until his psychologist reported that he was ready to return to Philadelphia. He resumed active ministry in Philadelphia on July 1, 1991, as an associate pastor at St. John the Baptist Church in Philadelphia. In May 1992, the pastor

of St. John the Baptist, Rev. Feeny, found pornographic material in the rectory mail addressed to Father DePaoli. Rev. Feeny reported this to Monsignor Jagodzinski in the Archdiocese, and further informed him of other inappropriate behavior in which Father DePaoli had engaged. In one incident, he had fourth through sixth grade girls dress in "paper cutouts" and act out a story in which he instructed each of them to act sexy and pretend to be enticing; in another incident when children were having Mass, he stated that he would like to see one of the eighth grade girls naked. N.T. 4/10/2012 at 139.

On July 7, 1992, Appellee met with Father DePaoli to assist Cardinal Bevilacqua in deciding Father DePaoli's future. At this meeting, Father DePaoli placed blame on other individuals and took no responsibility for his own conduct. Appellee recommended that Father DePaoli be placed on a leave of absence with restricted ministry, be informed that he would not receive another assignment in the Archdiocese of Philadelphia, and be encouraged to seek voluntary laicization. The Cardinal approved these recommendations. In February 1995, however, when Father DePaoli requested permission to celebrate his 25th anniversary of entering the priesthood (the "Silver Jubilee"), Appellee granted permission and provided a letter stating that Father DePaoli was a priest in good standing.

In September 12, 1995, Cardinal Bevilacqua approved a recommendation made by Appellee for Father DePaoli's residential assignment at St. Gabriel Rectory in Montgomery County, which Appellee had chosen because it did not have a grade school. While Father DePaoli resided at St. Gabriel Rectory, Sister Joan Scary, Director of Religious Education at St. Gabriel's, complained on several occasions to the Vicar for Montgomery County, who passed the information along to the Archdiocese,

that Father DePaoli was not restricting his ministry as directed and was instead repeatedly celebrating public liturgies, and was receiving suspicious packages in the mail.

In the spring of 1996, the pastor of St. Gabriel's Parish warned Sister Scary to stop making reports regarding Father DePaoli or she "could pack [her] bags" and "get the hell out of here." N.T. 4/9/2012 at 32-33, 40. She ignored this warning and repeated her concerns to the Archdiocese, for which she was immediately "fired" from her assignment on May 30, 1996.[19] On July 1, 1996, Appellee summarized the circumstances of Sister Scary's removal as resulting from making unfounded accusations against Father DePaoli, although he acknowledged that Father DePaoli had received a magazine from a division of "Gentleman's Quarterly," which had some "inappropriate content," and was improperly celebrating public Mass in violation of the restriction on his ministry. N.T. 4/10/2012 at 94.

In June 2002, Appellee met with a woman who reported that Father DePaoli had fondled her breasts in 1969-70 when she was 12 years old. Ultimately, following the Dallas Charter, the Archdiocese Review Board concluded that Father DePaoli had to be permanently removed from ministry based on "credible allegations of sexual abuse," which included his federal conviction, possession of pornography while on probation, credible allegations of inappropriate touching in 1969-70, recent possession of inappropriate magazines, and overt violations of his restricted ministry.

After several months of testimony against Appellee, including the above-recounted prior bad acts evidence, the Commonwealth rested its case on May 17, 2012,

---

[19] The ramifications of a nun's "firing" are not apparent on the record.

and, at that time, the trial court granted Appellee's motion for judgment of acquittal as to the charge of conspiring with Rev. Brennan. See Pa.R.Crim.P. 606(A)(1). Appellee further sought judgment of acquittal for the EWOC charge as well, which the trial court denied. Trial ended June 22, 2012, and the trial court charged the jury to consider whether Appellee was culpable for EWOC either as a principal or as Rev. Avery's accomplice.[20] The jury returned a verdict of guilty with respect EWOC as it related to

---

[20] The Crimes Code provides accomplice liability as follows:

(a) General rule.--A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

(b) Conduct of another.--A person is legally accountable for the conduct of another person when:

(1) acting with the kind of culpability that is sufficient for the commission of the offense, he causes an innocent or irresponsible person to engage in such conduct;

(2) he is made accountable for the conduct of such other person by this title or by the law defining the offense; or

(3) he is an accomplice of such other person in the commission of the offense.

(c) Accomplice defined.--A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(2) his conduct is expressly declared by law to establish his complicity.

(…continued)

Rev. Avery (as to D.G. and other unnamed minors), which the trial court graded as a third-degree felony because the jury found a "course of conduct of endangering the welfare of a child[.]" 18 Pa.C.S. § 4304(b).[21] The jury acquitted Appellee of EWOC as it related to Rev. Brennan and of conspiring with Rev. Avery.[22] The trial court sentenced Appellee to a term of three to six years of imprisonment.

In Appellee's statement of errors complained of on appeal, see Pa.R.A.P. 1925(b), he asserted, among other things, that the evidence was insufficient as a matter of law because he had no supervisory role over D.G. or the other children of St. Jerome's. The trial court responded in its Rule 1925(a) opinion that the statute did not require that an individual be a supervisor of a child to fall under the EWOC statute's reach. Rather, the person had to be a supervisor of the welfare of a child. The trial court held that the Commonwealth met its burden of proving this element of the offense by showing that Appellee oversaw, managed, or had authority over the well-being of children; specifically, by proving that Appellee controlled sexually abusive priests, and that it was his responsibility to protect the children of the Archdiocese of Philadelphia from future harm at the hands of these sexually abusive priests.

Appealing his judgment of sentence to the Superior Court, Appellee raised ten issues, two of which challenged the sufficiency of the evidence to sustain his conviction

---

(continued…)

18 Pa.C.S. § 306(a)-(c).

[21]    It is not known whether the jury considered Appellee guilty of EWOC as a principal or as an accomplice to Rev. Avery.

[22]    The jury failed to reach a verdict on the charges against Rev. Brennan.

for EWOC.  The first concerned his culpability as a principal actor, and the second his culpability as an accomplice.  The basis of Appellee's argument as to principal liability was that he was not within the scope of individuals subject to the EWOC statute because he did not directly supervise children.  Rather, according to Appellee, he supervised Rev. Avery, who was supervising the children.  In support of his argument, Appellee relied on the 2007 amendment to the EWOC statute as a compelling indication that the relevant (1995) version of the statute did not encompass individuals described by the amended language, *i.e.*, those who employ or supervise the class of individuals who were within the preview of the pre-amended version.

Responding to this argument, it was the Commonwealth's position that the plain meaning of the 1995 EWOC statute clearly encompassed the class of persons added by the 2007 amendment, and the amendment merely clarified, rather than changed, the statute's scope of liability.  Examining the plain language, the Commonwealth argued that the phrase "the welfare of" would be rendered superfluous by Appellee's interpretation.  In this respect, the Commonwealth endorsed the trial court's distinction between actual supervision of children and supervision of the welfare of children as the basis for Appellee's liability for EWOC as a principal.

Considering first whether the evidence was sufficient to sustain Appellee's conviction for EWOC as a principal, the Superior Court examined the statutory language of the EWOC statute and concluded that because Appellee was not a parent or guardian, the issue in this case was the scope or breadth of the phrase "or other person supervising the welfare of a child[.]"  Although the Superior Court acknowledged direction from this Court that the EWOC statute was intended "to cover a broad range of

conduct in order to safeguard the welfare and security of our children," Lynn, 83 A.3d at 449 (citing Commonwealth v. Mack, 359 A.2d 770, 772 (Pa. 1976)), it observed that neither it nor this Court had ever affirmed a conviction for EWOC where the accused was not actually engaged in or was responsible for the supervision of an endangered child. Id. at 450. Rather, it construed its decision in Commonwealth v. Halye, 719 A.2d 763 (Pa.Super. 1998) (*en banc*), to require proof that the defendant was directly supervising the child.

In Halye, the defendant was visiting the home of a family member. While the adults were in one part of the home, the children were in their bedroom playing. The defendant excused himself to use the restroom, but went instead into the children's bedroom. When he did not promptly return, the children's mother went to check on him, and discovered the defendant in the closet with her son, his head placed near her son's exposed privates. Halye, 719 A.2d at 765. On appeal from the defendant's subsequent conviction for EWOC,[23] the Superior Court reversed, finding "insufficient evidence of [the defendant's] role as a supervisor or guardian of the child to support the [EWOC] conviction." Id. Specifically, the Superior Court observed that there was no testimony that the defendant had been asked to supervise the children in any capacity or that such a role was expected of him, and instead characterized him as a mere visitor to the home, where the children's parents were home and supervising them.

The Commonwealth had argued against the applicability of Halye, asserting that the Superior Court in that case simply applied the law to the facts presented and

---

[23] The defendant in Halye was also convicted of involuntary deviate sexual intercourse, indecent assault, and corruption of minors.

overturned the conviction because the defendant was not supervising the children or their welfare in any respect, being just a visitor in the house, in contrast to Appellee, whose responsibility was to protect the welfare of the children of the Archdiocese from sexually abusive priests.

The Superior Court disagreed with the Commonwealth about the persuasive authority of Halye for several reasons. First, it interpreted that case as requiring actual supervision of children as an element of EWOC. Lynn, 83 A.3d at 452 (citing Halye, 719 A.2d at 765 (". . . we conclude that [the Commonwealth] failed in its burden of proving that [the defendant] was in the position of supervising the children at the time of the assault.")). Second, the Superior Court considered that by focusing on Appellee's responsibility to the children of the Archdiocese, the Commonwealth's argument improperly conflated two distinct elements of EWOC: supervision and duty. Third, although the factual circumstances of Halye were distinct, the Superior Court therein confronted the same legal issue presented in this case: whether the accused must be a supervisor of a child for culpability to arise under the EWOC statute.

Because the trial court did not consider Halye, the Superior Court considered its statutory construction to be faulty, and was further not convinced by the trial court's "parsing of the terms 'the welfare of'" because it "adds ambiguity where none need exist." Id. at 453. For EWOC criminal liability to attach, according to the Superior Court, a person who is not a parent or a guardian of the endangered child must be engaged in the supervision, or be responsible for the supervision, of a child. Id. In this respect, the Superior Court found most significant the lack of evidence that Appellee had any direct supervision over D.G. or any other child put at risk by Rev. Avery's presence at

St. Jerome's, and held that the evidence was therefore not sufficient to support Appellee's conviction for EWOC as a principal actor. Lynn, 83 A.3d at 447.

Although the Superior Court concluded that Appellee could not be convicted as a principal for EWOC, it recognized that there was an independent avenue by which the jury could have convicted him because it had been charged to consider Appellee's culpability for EWOC as Rev. Avery's accomplice. The court concluded, however, that Appellee's accomplice liability was not supported by sufficient evidence that Appellee acted with the intent to promote or facilitate the commission of EWOC by Rev. Avery, because Appellee did not know D.G. or know of him, was not sufficiently aware of Rev. Avery's supervision of him or any other child at St. Jerome's, and he had no specific information that Rev. Avery intended to or was preparing to molest D.G. or any other child.

Accordingly, the Superior Court determined the evidence was not sufficient to support the EWOC conviction as either a principal or an accomplice, and reversed the judgment of sentence. We granted the Commonwealth's petition for allowance of appeal to address two issues:

> (1) Was the evidence insufficient to prove endangering the welfare of children because defendant did not have direct contact with children?
>
> (2) Assuming arguendo defendant could not endanger the welfare of children in his individual capacity, but as part of a general scheme placed a known sexual predator under his control in a position that promoted the risk of further sexual assaults, was the evidence sufficient to convict him as an accomplice?

Commonwealth v. Lynn, 91 A.3d 1233 (Pa. 2014). Our review of this case focuses largely upon the Superior Court's interpretation of a statute and its application of proper

legal principles. These are questions of law, to which our standard of review is *de novo* and our scope of review is plenary. See Bowling v. Office of Open Records, 75 A.3d 453, 466 (Pa. 2013); Anderson v. McAfoos, 57 A.3d 1141, 1148 (Pa. 2012). Additionally, because the legal issues are premised on the sufficiency of the evidence, the record is read in the light most favorable to the Commonwealth as verdict winner, with the benefit of all reasonable inferences therefrom. See, e.g., Commonwealth v. Pagan, 950 A.2d 270, 278 (Pa. 2008).

Moreover, in this endeavor we are guided by the well settled principles of statutory construction. The purpose of statutory construction is to ascertain and effectuate the intent of the legislature. 1 Pa.C.S. § 1921(a). In this respect, the language of the statute is the best indication of this intent; accordingly, where the words of the statute are clear and free from all ambiguity, the letter is not to be disregarded under the pretext of pursuing its spirit. Id., § 1921(b). Only in the event of an ambiguity may we consider other aspects of the statute and the statutory process, and may we discern the General Assembly's intent by considering, *inter alia*, the various factors listed in the Statutory Construction Act, Id., § 1921(c). See Commonwealth v. Walls, 926 A.2d 957, 962 (Pa. 2007).

Generally speaking, under the rule of lenity, penal statutes are to be strictly construed, with ambiguities resolved in favor of the accused. Commonwealth v. Lassiter, 722 A.2d 657, 660 (Pa. 1998). In the peculiar context of EWOC, however, we have held that the statute is protective in nature, and must be construed to effectuate its broad purpose of sheltering children from harm. Mack, 359 A.2d at 770. Specifically, the purpose of such juvenile statutes is defensive; they are written expansively by the

legislature "to cover a broad range of conduct in order to safeguard the welfare and security of our children." Id. at 772 (quoting Commonwealth v. Marlin, 305 A.2d 14, 18 (Pa. 1973)). In the context of protective juvenile legislation, therefore, we have sanctioned statues that, rather than itemizing every undesirable type of conduct, criminalize instead the "conduct producing or tending to produce a [c]ertain defined result. . ." Marlin, 305 A.2d at 18. We have accordingly observed:

> The common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it.

Id. (quoting Commonwealth v. Randall, 133 A.2d 276, 280 (Pa.Super. 1957)).

In the face of a challenge to the EWOC statute as being unconstitutionally vague, being cognizant of the protective purpose of such juvenile acts, we held the EWOC criminal statute was not facially unconstitutionally imprecise. Mack, 359 A.2d at 772. We considered that the language contained therein, specifically, "endangers the welfare of the child" and "duty of care, protection or support," are not esoteric; rather, we discerned that they are easily understood and given content by the community at large. Id. Accordingly, we reasoned that "an individual who contemplates a particular course of conduct will have little difficulty deciding whether his intended act 'endangers the welfare of the child' by his violation of a 'duty of care, protection or support.'" Id.[24]

---

[24] Appellee has attempted to limit the persuasiveness of Mack by characterizing it as dealing with conduct, not potential defendants, and therefore shedding no light on the meaning of "a person supervising the welfare of a child." The import of Mack, however, is that the legislature intended to draw the EWOC statute broadly to give effect to its protective purpose, an intent that guides our interpretation and application of the statute herein.

With these principles in mind, we turn to the parties' arguments as to the first issue: whether the evidence was sufficient to prove EWOC where Appellee did not have direct contact with children. Relying on our holding in Mack, that the EWOC statute is necessarily drawn broadly to capture conduct that endangers the welfare of a child, and Superior Court precedent explaining that EWOC "involves the endangering of the physical or moral welfare of a child by an act or omission in violation of a legal duty," Commonwealth v. Taylor, 471 A.2d 1228, 1230 (Pa.Super. 1984), the Commonwealth focuses on the intent element of the offense. Because the crime of EWOC is a specific intent crime, Commonwealth v. Cardwell, 515 A.2d 311, 313 (Pa.Super. 1986), and the intent required is the knowing violation of a duty of care, id., the Superior Court has long interpreted the intent element to require that: (1) the accused is aware of his/her duty to protect the child; (2) the accused is aware that the child is in circumstances that could threaten the child's physical or psychological welfare; and (3) the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare. Commonwealth v. Wallace, 817 A.2d 485, 490-91 (Pa.Super. 2002); Commonwealth v. Vining, 744 A.2d 310, 315 (Pa.Super. 1999) (*en banc*); Commonwealth v. Martir, 712 A.2d 327, 328-29 (Pa.Super. 1998); Commonwealth v. Pahel, 689 A.2d 963, 964 (Pa.Super. 1997); Commonwealth v. Fewell, 654 A.2d 1109, 1118 (Pa.Super. 1995) Commonwealth v. Miller, 600 A.2d 988, 990 (Pa.Super. 1992); Commonwealth v. Campbell, 580 A.2d 868, 870 (Pa.Super. 1990); Cardwell, 515 A.2d 311, 315.

Applying the evidence presented to the legal question of whether Appellee knowingly endangered the welfare of a child by violating a duty of care, protection, or support, the Commonwealth argues that it clearly established that it was Appellee's undisputed duty to protect children from sexual predator priests; he was aware that children were in danger of sexual abuse when exposed to such priests; and he failed to take protective action and, indeed, actually exposed children to the danger of being sexually molested.

Addressing the class of individuals to whom the EWOC statute applies, the Commonwealth argues that it has never been in dispute, until this case, that the offense involves endangering the physical or moral welfare of a child by an act or omission in violation of a legal duty; that is, a "person supervising the welfare of a child" means a person who has a duty to provide "care, protection, or support" to a child. See 18 Pa.C.S. § 4304 (1995); Taylor, 471 A.2d at 1230; Vining, 744 A.2d at 315 ("[O]ne endangers the welfare of a child if he or she knowingly violates a duty of care, protection or support."); Commonwealth v. Ogin, 540 A.2d 549, 553 (Pa.Super. 1988) (*en banc*) (providing that the statute "is a comprehensive provision designed to penalize those who knowingly breach a legal duty to protect the well-being of children who are entrusted to their care."). According to the Commonwealth, a duty of care can be proven through evidence of a supervisory role. See Commonwealth v. Bryant, 57 A.3d 191, 198 (Pa.Super. 2012) (recognizing that the duty of care has, on multiple occasions, been extended to those who exercise a supervisory role over children).

According to the Commonwealth, one who acts in a capacity of protecting children, supervises another person who interacts with those children, and is aware that

this other person is a threat to the welfare of those children, but does nothing, or, as in this case, takes actions which exacerbate child abuse, violates the EWOC statute. Because supervision is routinely accomplished through others, the Commonwealth argues that the statute is broad enough to cover the conduct of individuals who may not personally encounter the children, such as school principals or day care managers, as long as the other elements of the EWOC statute are met. Under the facts presented, the Commonwealth argues that Appellee endangered the welfare of children, including D.G., by breaching his undisputed duty to prevent priests whom he knew to be a danger to children and who were under his supervision from sexually molesting them; in other words, his supervision of Rev. Avery was the supervision of the welfare of children.

The Commonwealth criticizes the Superior Court opinion for adding a non-statutory element to the offense of "actual" or "direct" child supervision, noting that the statute says nothing that would exclude supervision of the welfare of a child that is not sufficiently actual or direct. Moreover, the Commonwealth observes that the text of the statute refers to a person supervising "the welfare of a child," not a person supervising "a child."

Turning to the Superior Court's reliance on Halye, the Commonwealth argues that this reliance was misplaced. Rather than holding that supervision as used in the EWOC statute must be actual or direct supervision of the child or children, as the Superior Court interpreted Halye to do, the Commonwealth views that case much more narrowly. According to the Commonwealth, Halye says nothing about whether supervision must be actual or direct, and did not conclude that the defendant therein was supervising too indirectly to be guilty of the offense. Rather, the Commonwealth

argues that the Halye court found the defendant was not supervising the children at all, having no duty whatsoever to the children, and therefore could not be guilty of having violated that duty. The Commonwealth considers Halye to hold merely that the sexual molestation of a child does not prove that the assailant had a duty of care to that child.

Having refuted the Superior Court's statutory construction and reliance on Halye, the Commonwealth argues that the Superior Court's decision in the instant case is left unsupported. Reviewing the evidence against Appellee that it introduced at trial, the Commonwealth concludes that it sufficed to demonstrate that Appellee had a duty, as he readily conceded at trial, to protect children from abusive priests under his control; he knew that children who encountered such priests were in danger of sexual assault; and he failed to take action to remove priests from the locations or roles which allowed them to abuse children freely, thereby exposing children to the very danger it was his duty to prevent. Having proven the statutory elements of the offense, the Commonwealth urges this Court to reverse the Superior Court and reinstate Appellee's conviction.

Confronting the legislative amendment of the EWOC statute, effective in 2007, the Commonwealth makes several arguments. First, it argues that the pre-amended version is to be interpreted on the unambiguous language contained therein and that the amendment is irrelevant to this interpretation. Second, the only way in which another version of the law is relevant to statutory interpretation is upon the finding of ambiguity, and consideration is then limited to the former law, not a subsequent amendment. See 1 Pa.C.S. § 1921(c) (providing that when there is statutory ambiguity, it may be resolved by consideration of, *inter alia*, the former law); Commonwealth v.

Shaffer, 734 A.2d 840, 843-44 (Pa. 1999) (providing that a subsequent amendment cannot retroactively define legislative intent in the pre-amendment provision). Third, the Commonwealth argues that to the extent this Court considers this particular change in the law to be relevant, it represented not a change in intent, but a clarification and reinforcement of the existing intent. See, e.g., Commonwealth v. Corporan, 613 A.2d 530, 531 (Pa. 1992). Finally, the Commonwealth notes that notwithstanding earlier prosecutorial reluctance to bring criminal charges against church officials, the 2005 Grand Jury Report itself stated that actions of Archdiocesan officials clearly constituted endangerment of the welfare of children, but recommended amending the statute to clarify that a Church official not in contact with a child may nevertheless be supervising the welfare of a child.

Appellee responds to the Commonwealth's arguments by relying on the statutory language, the Superior Court's analysis, and the 2007 amendment to the EWOC statute. Appellee argues, based on the statutory language, that the requirements of "supervising the welfare of a child" and "violating a duty of care" are distinct. As support, Appellee relies primarily on Commonwealth v. Brown, 721 A.2d 1105, 1107 (Pa.Super. 1998), where the Superior Court rejected the defendant's argument that he was not supervising the welfare of a child because he had no duty to report the child abuse he witnessed, stating that "person" and "duty" were two elements, not one, id. at 1107 & n.3.

Appellee further purports to rely on the plain language of the pre-amended EWOC statute to argue that that because the phrase "a person supervising the welfare of a child" follows the words "parent or guardian," it applies exclusively to individuals

who stand in the place of parents. See, e.g., Commonwealth v. Martir, 712 A.2d 327, 330 (Pa.Super. 1998) (Beck, J., concurring) (nothing that EWOC is contained in Article D of the Crimes Code, entitled "Offenses Against the Family" as opposed to "Offenses Against the Person"). In this respect, Appellee asserts that appellate courts have only applied the EWOC statute to parents or parental surrogates. See, e.g., Commonwealth v. Kellam, 719 A.2d 792, 796 (Pa.Super. 1998) (affirming a conviction for EWOC and stating that the statute applies to babysitters and others who have permanent or temporary custody and control of a child); Commonwealth v. Brown, 721 A.2d 1105, n.6 (Pa.Super. 1998) (opining that "[p]roof that such adults were actually supervising a child requires evidence that the adult was involved with the child.").

Additionally, Appellee argues that every EWOC conviction in reported cases has arisen out of the defendant's involvement with a particular child rather than a non-specific class of possible victims. See, e.g., Commonwealth v. Smith, 956 A.2d 1029 (Pa.Super. 2008) (father convicted of EWOC for abusing his own child over whom he had exclusive supervisory control); Commonwealth v. Trippett, 932 A.2d 188 (Pa.Super. 2007) (defendant convicted of EWOC for abuse he perpetrated against a child with whom he lived and directly supervised). Considering this case law, Appellee argues that he was not a supervisor of any child under the EWOC statute because he had no direct contact with any children.

Like the Superior Court, Appellee finds Halye particularly persuasive. According to Appellee, by focusing on the fact that the defendant in Halye had neither been asked to supervise the children nor expected to do so, the Superior Court therein indicated that actual supervision of the child is essential to EWOC liability. Because Appellee

neither met D.G. nor knew of him, Appellee argues he, like the defendant in <u>Halye</u>, could not be a person supervising D.G.'s welfare.

Turning away from the Superior Court's analysis and to the 2007 amendment of the EWOC statute, and to how it bears on our interpretation of the pre-amendment language, Appellee relies on the Commonwealth's prosecutorial decisions prior to bringing charges against Appellee. Specifically, in 2005, following the Grand Jury Report, the District Attorney's Office indicated in a report that high level Archdiocesan officials were far removed from direct contact with children. The Grand Jury Report and the District Attorney's decision not to prosecute at that time prompted the legislative amendment effective 2007. These circumstances, and the concurrence of legislators who advocated for the amendment, indicate, in Appellee's mind, that there was consensus that his conduct was outside the reach of the EWOC statute. Appellee suggests that the District Attorney's Office cannot now change course, and is bound by its prior decision that it could not hold him accountable for his conduct as a supervisor. In this respect, Appellee argues that the Commonwealth's 2011 decision to charge him under the 1995 version of the EWOC statute belies its present argument that the 2007 statute was merely a clarification of the prior version.[25]

According to Appellee, the 2007 amendment was necessary to expand the reach of the statute to add a class of persons not originally subject to liability: "a person that employs or supervises" an individual who is directly responsible for the welfare of a

---

[25] Specifically, Appellee argues that a clarification in the law would not implicate *ex post facto* concerns, and the Commonwealth therefore would have been free to pursue charges under the 2007 version notwithstanding that Appellee's criminal conduct took place years before.

child.  See Masland v. Bachman, 374 A.2d 517, 521 (Pa. 1977) ("[A] change in the language of a statute ordinarily indicates a change in legislative intent.").  Appellee argues that the new language of the amendment would be rendered superfluous if it has the same meaning as the pre-amended statute.  See Commonwealth v. Dixon, 53 A.3d 839, 845-46 (Pa.Super. 2012) ("Where certain things are designated in a statute, all omissions should be understood as exclusions," as the "General Assembly [is] more than capable of drafting [the statute to include what it wishes to include].").

As noted above, because this case focuses on the competing arguments of statutory interpretation, we will begin our analysis, as we must, with the plain language of the 1995 EWOC statute under which Appellee was charged.  In considering the terms of the EWOC statute, we are cognizant of our obligation to construe such protective juvenile statutes broadly to safeguard the welfare and security of children.  Mack, 359 A.2d at 772.  As we have instructed, this broad protective purpose, as well as the common sense of the community and the sense of decency, propriety, and morality which most people entertain, guides the determination of whether Appellee's particular conduct is rendered criminal by the EWOC statute.  Id.; Randall, 133 A.2d at 280.

With these factors in mind, we turn to the language of the 1995 statute, which defines EWOC as follows:  "A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support."  18 Pa.C.S. § 4304 (1995).[26]  In commenting on this statute, the Pennsylvania Joint State

---

[26]  This statute was adapted from the Model Penal Code of the American Law Institute, which provides: "A parent, guardian, or other person supervising the welfare of
(…continued)

Government Commission stated that the offense "involves the endangering of the physical or moral welfare of a child by an act or omission in violation of legal duty even though such legal duty does not itself carry a criminal sanction." Mack, 359 A.2d at 771. As Appellee was neither parent nor guardian, the Commonwealth had to prove that he fell within "other person supervising the welfare of a child. . . ."

Although the Commonwealth argues that the statutory element requiring one to be "a parent, guardian or other person supervising the welfare of a child. . ." is defined by whether that person has a "duty of care, protection or support," so that the elements of supervision and duty are entwined, we find it unnecessary to resolve the merit of this proposition. Appellee's sufficiency challenge was confined to whether he could be criminally liable for "supervising the welfare of a child" in the absence of direct supervision of children. The Commonwealth's issue on appeal is whether the evidence was insufficient to prove EWOC because Appellee did not have direct contact with children.

Therefore, whether Appellee owed a duty of care to the children of St. Jerome's, or to D.G. in particular, is not an issue in this appeal and was not encompassed within our grant of allowance of appeal. Rather, the legal issue we address concerns solely whether the evidence sufficed to prove Appellee's supervision of the welfare of a child. While we recognize that the answer to this question will in most circumstances be informed by exploring the extent of the duty owed to the endangered child, we need not engage in such an exploration herein; nor do we wade into an unnecessary review of

---

(continued…)
a child under 18 commits a misdemeanor if he knowingly endangers the child's welfare by violating a duty of care, protection or support." Model Penal Code § 230.4.

the trial court's conclusions regarding other elements of EWOC, including that the Commonwealth's evidence sufficed to prove that Appellee was aware of his duty of care, protection or support, that he violated this duty, or that he knowingly endangered the welfare of a child, because, again, these questions are beyond our grant of allowance of appeal.

Focusing on the supervision element, the statute is plain and unambiguous that it is not the child that Appellee must have been supervising, but the child's welfare, including that of D.G. As the Pennsylvania Joint State Government Commission observed, welfare encompasses the physical or moral welfare of a child. 18 Pa.C.S. § 4304 (comment); Mack, 359 A.2d at 771. And as the Superior Court observed, "welfare" is defined by the American Heritage Dictionary as "health, happiness, or prosperity; well-being," and by Black's Law Dictionary as "[w]ell-being in any respect; prosperity." Lynn, 83 A.2d at 453 (citing American Heritage Dictionary 923 (4th ed. 2001) and Black's Law Dictionary 1625 (8th ed. 1999)). By requiring supervision of the child's welfare rather than of the child, the statute endeavors to safe-guard the emotional, psychological, and physical well-being of children.

Because that which is supervised is the child's physical or moral welfare, the Commonwealth's evidence must demonstrate just that: Appellee was supervising the welfare of a child, here, D.G., as well as other unnamed minors. Indeed, criminal liability does not turn on whether the offender was supervising D.G. or the other children of St. Jerome's, a construction which would render meaningless the precise statutory language encompassing the child's welfare. Moreover, the requirement of supervision is not limited to only certain forms of supervision, such as direct or actual, as the

Superior Court held. By its plain terms it encompasses all forms of supervision of a child's welfare. Respectfully, the Superior Court disregarded this plain language when it attempted to modify it with the qualifiers of direct or actual supervision of children. Further, as the Commonwealth correctly argues, supervision is routinely accomplished through subordinates, and is no less supervisory if it does not involve personal encounters with the children. Like Appellee, school principals and managers of day care centers supervise the welfare of the children under their care through their management of others. Depending upon the facts, they could be criminally liable for endangering the welfare of the children under their supervision if they knowingly place sexually abusive employees in such proximity to them as to allow for the abuse of these youth.

Simply put, Appellee did not safeguard the physical and moral welfare of D.G. by placing Rev. Avery, a known child molester, in a position to molest him. For all his legal gyrations, it was precisely this conduct that brought Appellee within the class of individuals subject to criminal liability for EWOC: by his own concession, he supervised the welfare of the children of the Archdiocese, including D.G., and knowingly endangered D.G.'s welfare by placing Rev. Avery in a location and situation that gave him free license to abuse D.G.

Specifically, examining the supervision element against the facts presented, we agree with the Commonwealth that extensive evidence established that Appellee was supervising the welfare of D.G. and other children of the Archdiocese in his capacity as Secretary for Clergy because he was uniquely responsible for safeguarding all of their physical and moral welfare, and he supervised and directed the priests who directly

interacted with them. The evidence demonstrates that in his position as Secretary for Clergy, Appellee was the "point man" in the Archdiocese to address allegations of sexual abuse by clergy, spending much of his time in this endeavor. According to Appellee's trial testimony, he considered protecting children, including D.G., to be the most important part of his job, a duty that encompassed investigating reports of sexual misconduct by Archdiocesan priests, including the sexual abuse of children in the Archdiocese, and acting to protect them by determining whether to remove a priest from ministry so "children could be taken out of his way." N.T. 5/16/2012 at 198. It was Appellee's responsibility "to ensure that no child would be hurt." N.T. 5/23/2012 at 198.

The Commonwealth's evidence established that despite being responsible for responding to sexual abuse allegations against priests for the purpose of protecting the welfare of D.G. and other children, Appellee mollified victims of sexual abuse by falsely telling them their allegations were being seriously investigated and that the particular priest would never again be assigned around children, despite knowing that the priests under his supervision would merely be reassigned to another parish with no ministry restrictions on contact with children; he informed parishioners that the priests he transferred were moved for health reasons, leaving the welfare of children in jeopardy; he routinely disregarded treatment recommendations for priests; he failed to inform the relocated priest's new supervisor about abuse allegations; he took no action to ensure that the abusive priest was kept away from children at his new assignment; he suppressed complaints and concerns by the colleagues of the priests; all with the knowledge that sexually abusive priests rarely had only one victim and that all of these actions would endanger the welfare of the diocese's children, including D.G. Finally,

and even more egregiously, when Appellee was contacted by law enforcement, he misrepresented facts to thwart their investigation of these priests, and their crimes.

Examining his conduct specifically in relation to Rev. Avery and D.G., the evidence established that Appellee endangered D.G.'s welfare by facilitating the living arrangement that gave Rev. Avery access to him, while believing Rev. Avery to be "guilty of sexual misconduct with minors." The information that convinced Appellee that Rev. Avery was "guilty of sexual misconduct with minors" involved the allegations brought by R.F. in 1992 and Rev. Avery's admission that "it could be" that the events described by R.F. occurred under the influence of alcohol.

When Appellee referred Rev. Avery for mental health treatment at St. John Vianney prior to placing him in proximity to D.G., Appellee failed to provide details of the sexual abuse and focused instead of Rev. Avery's propensity to consume alcohol. Despite the warnings of the staff at St. John Vianney that they were concerned about other victims, that Rev. Avery should be placed in an assignment that excluded children, and Rev. Avery's own admission that the conduct R.F. reported "must have happened," Appellee initially recommended that Rev. Avery be made associate pastor at a parish with a grade school. When Cardinal Bevilacqua rejected this recommendation, Appellee found a chaplaincy for him that included housing away from children, but, at Rev. Avery's request, Appellee petitioned Cardinal Bevilacqua to allow Rev. Avery to live instead in the rectory of St. Jerome's Church, a parish with a grade school and where D.G. was to become an altar boy.

Appellee instructed Father Graham that Rev. Avery was not to be around children, but that Rev. Avery was to offer his assistance at the parish, which necessarily

brought him into regular contact with children acting as altar boys, including D.G.. Although Father Graham was purportedly assigned to help monitor Rev. Avery, he did not understand himself to be Rev. Avery's supervisor. Other priests in the rectory believed Rev. Avery was there because of overwork. Appellee did not warn parishioners of St. Jerome's about Rev. Avery, and informed his former parishioners that his departure was for health reasons.

When Rev. Avery's associate at the hospital reported to Appellee that Rev. Avery's disc jockeying priorities were consuming much of his time, the same grooming behavior in which he had engaged with regard to R.F. prior to sexually abusing him, Appellee disregarded these warning signs. Appellee did nothing even when R.F. expressed shock at seeing Rev. Avery disc jockeying a dance in 1998, and when Appellee became aware that Rev. Avery was minimizing his sexual abuse of R.F. He further instructed Father Kerper, who had reported Rev. Avery's behavior to Appellee, to take his complaints about Rev. Avery to the hospital, not the Archdiocese.

Several months before D.G. began to train to serve Mass at St. Jerome's, and to fall victim to Rev. Avery's deviant proclivities, Dr. Pellegrini expressed concern that Rev. Avery's behavior indicated there was potential "for further acting out," N.T. 3/27/2012 at 92, and after meeting with Rev. Avery on April 2, 1998, Appellee perceived that Rev. Avery was minimizing his treatment and the allegations against him. Yet he did nothing to prevent Rev. Avery from further "acting out."

Indeed, it was shortly after Dr. Pellegrini voiced his concern, R.F. expressed shock at seeing Rev. Avery disc jockeying a dance, and Appellee perceived that Rev. Avery was once again minimizing his need for treatment and the sexual abuse

allegations against him, that Rev. Avery sexually abused D.G. In early 1999, after school one afternoon, Rev. Avery pulled D.G. aside and instructed him that their "sessions" were about to begin. A week later, following Mass, Rev. Avery asked the boy to stay behind. Once everyone left, Rev. Avery took D.G. to the sacristy and sexually assaulted him, repeating this behavior again about two weeks later.

The plain reading and common sense of the phrase "supervising the welfare of a child" leaves little doubt that Appellee's actions constituted endangerment of D.G., whose welfare he was responsible for safeguarding. Further, the broad protective purpose of the statute, the common sense of the community, and the sense of decency, propriety, and morality which most people entertain, coalesce and are actualized in our conclusion that Appellee's particular conduct is rendered criminal in accord with the EWOC statute. See Mack, 359 A.2d at 772; Randall, 133 A.2d at 280. Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, the Commonwealth proved beyond a reasonable doubt that as Secretary for Clergy Appellee's day-to-day responsibilities involved receiving allegations of clergy sexual abuse and reacting to them for the protection of the children of the Archdiocese from harm by sexually abusive priests over whose assignments Appellee exercised significant influence. Appellee endangered the welfare of D.G., whose well-being he supervised, when he placed Rev. Avery in a position to have access to him.

The Superior Court below faulted the trial court in this case for failing to consider Halye, which it found to be directly on point and in conflict with the trial court's reasoning that actual/direct supervision of a child is not required for an EWOC conviction under the 1995 version of the statute. Lynn, 83 A.3d at 451. Halye,

however, is factually distinct and not persuasive for the Superior Court's conclusion that supervision has to be direct or actual. The defendant in Halye was a mere visitor to the house of the child whose welfare he was convicted of endangering; he had no supervisory authority over anyone. Halye, 719 A.2d at 765. The children's parents were home, and were supervising their children's welfare. Id. Halye signifies nothing with respect to the element of supervision and merely held that one's conduct in molesting a child they happened upon, while serious criminal behavior, is not the conduct the EWOC statute was designed to criminalize. The Superior Court's criticism of the trial court for failing to consider Halye was not only uncalled for, but the Superior Court's analysis of the controlling nature of that case was incorrect.

Nor are we persuaded by Appellee's reliance on the 2005 Grand Jury Report reflecting the belief that the 1995 EWOC statute could not reach his conduct, the prior Philadelphia District Attorney's decision not to prosecute due to the same belief, or the subsequent legislative amendment of the penal statute. The decisions of neither the grand jury nor a prior District Attorney prove the meaning of the EWOC statute, which is determined by analyzing the plain language contained therein. What the members of the grand jury or the prior District Attorney believed about the scope of the statute is irrelevant.

So too is the legislature's subsequent amendment of the statute. First, legislative history is not to be consulted where, as here, the statute is explicit. 1 Pa.C.S. § 1921. We have applied the plain language of the relevant, pre-amendment statute to hold that it did not exclude those who supervised the welfare of a child, regardless of whether they directly supervised the child. Appellee cannot avoid the plain language by relying

on a subsequent amendment. A subsequent change in language does not retroactively alter the legislative intent that is apparent in the plain language of the prior version of the statute.

Legislative history is generally understood to encompass a retrospective review of the legislative consideration of a statute, not a review of the oxymoronic subsequent legislative history. See, e.g., Sullivan v. Finkelstein, 496 U.S. 617, 631 (1990) (Scalia, J., concurring) ("The legislative history of a statute is the history of its consideration and enactment. 'Subsequent legislative history'—which presumably means the post-enactment history of a statute's consideration and enactment—is a contradiction in terms."). We cannot discern the legislative intent of the General Assembly that passed the relevant, prior version of the EWOC statute by examining the intent of the General Assembly that amended that statute. See Axe Science Corp. v. Commonwealth, 293 A.2d 617, 620 (Pa.Cmwlth. 1972) (". . . to hold that subsequently drafted amendatory legislation. . . can somehow demonstrate a legislative intent as to the previously enacted legislation . . . would be to hold that legislators in a subsequent legislative session could be permitted to indicate the legislative intent of legislators at a prior legislative session . . ."). Further, while the former version of a statute is relevant to discern the legislative intent of a later version when the statutory language is ambiguous, the inverse is not true. See 1 Pa.C.S. § 1921(c)(5) (providing that when the words of the statute are not explicit, the General Assembly's intent may be ascertained by considering, among other things, the former law).

Finally, Appellee argues that the EWOC statute has not heretofore been applied to someone like himself, who did not come into contact with the children whose welfare

he endangered. We find this argument to be inconsequential and irrelevant. Our analysis of the plain language of the EWOC statute and examination of whether the voluminous facts of record met the supervision element of the offense are not dependent on the factual circumstances that led to convictions in prior cases.

The Superior Court erred in holding that the EWOC statute required evidence of direct supervision of children and overturning Appellee's conviction on that basis. The Commonwealth's evidence sufficed to show that that Appellee was a person supervising the welfare of many children, including D.G. Because we conclude that the Commonwealth's evidence was sufficient to sustain the conviction for EWOC as a principal, we do not address the separate contention that the evidence was insufficient to sustain the EWOC conviction as an accomplice. The Order of the Superior Court is reversed, and the matter is remanded for further proceedings consistent with this opinion.

Former Chief Justice Castille did not participate in the decision of this case.

Mr. Justice Eakin, Madame Justice Todd and Mr. Justice Stevens join the opinion.

Mr. Chief Justice Saylor files a dissenting opinion.