J-S44032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LINDA R. NOLAN | : | |
| | : | |
| Appellant | : | No. 1002 MDA 2022 |

Appeal from the Judgment of Sentence Entered March 23, 2022
In the Court of Common Pleas of Franklin County Criminal Division at
No(s):  CP-28-CR-0000017-2019

BEFORE:  PANELLA, P.J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:        **FILED: FEBRUARY 2, 2023**

Linda R. Nolan (Nolan) appeals from the judgment of sentence imposed in the Court of Common Pleas of Franklin County (trial court) following her jury conviction of four counts of endangering the welfare of a child (EWOC).[1] Nolan challenges the sufficiency of the evidence supporting her conviction and claims a new trial is necessary because of prejudicial comments made by a prospective juror during *voir dire*.  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 4304(a)(1), (b)(2) (child under 6 years of age).  The jury found Nolan not guilty of two counts of EWOC concerning other children.

**I.**

This case arises from Nolan's conduct during her tenure as owner of Miracle Bush Daycare Center (the Daycare) and her treatment of four children under the age of six years old who attended the daycare program — W.M., C.H., A.R. and J.M.[2]  The evidence showed that Nolan verbally berated these children, used age-inappropriate "bucket seats" and highchairs as restraining and disciplinary tools for inordinate periods of time, and labeled some of them autistic although they were too young for a formal diagnosis.  On October 19, 2018, after an incident involving Nolan and W.M., four employees quit their positions at the Daycare and contacted authorities out of concern for the welfare of the children.  EWOC charges were brought based on Nolan's conduct involving each of the four children.

**A.**

The trial court conducted jury selection in November 2021 during which venireperson #131 made the follow remarks indicating that she could not remain impartial:

> [Juror #131]: Through my business I have heard stories.  From another daycare center they have heard stories.  I pretty much already figured that they are guilty from the stories that I have heard.
>
> [The Court]: All right.  Well I'm going to ask you to not—

---

[2] Nolan's husband, Michael Nolan, worked at the Daycare as a cook and was her co-defendant at trial.  Mr. Nolan was found not guilty of one count of EWOC.

[Juror #131]: I mean, I have heard—

[The Court]: Hold on.  Could you stop, please?

[Juror #131]: Yeah.

[The Court]: All right.  I want you to respect the fact that these two individuals are going to come before the Court for trial where the Commonwealth has the burden of proving their guilt and so I respect the fact you believe that you can't be fair, but what I would ask you to do is to keep your stories to yourself so that all the rest of these folks have an opportunity to decide the case based on the evidence presented at trial.

[Juror #131]: I have heard a lot of stories and I can't be impartial.

[The Court]: All right.  Thank you.

(N.T. Jury Selection, 11/22/21, at 13-14).  Defense counsel requested a sidebar, where the following discussion took place:

[Defense Counsel:] My concern is this Juror 131 that keeps opining about—she mentioned that she believes my clients are guilty in front of the panel and then she won't be quiet despite the Court's admonitions for her to be quiet.  I'm concerned one, that she may have already tainted the jury pool, but secondly, I'm concerned that her remaining, even if we proceed, that she will not shut up.

[The Court]: Okay.  So I agree with you, I need to get rid of her, because despite my efforts to try to explain why it was important that she not continue to talk, she doesn't seem to get it and wants to tell everyone all about it.  I agree.  I'm going to ask her — I'm going to send her home.

(*Id.* at 14).

Defense counsel then asked the trial court to question Juror #131 as to whether "she's had access to anyone else" in the jury pool.  (*Id.* at 15).  While the trial court declined to do so, it stated that it would question the remaining

venirepersons as to their ability to remain impartial in light of any outside information they may have heard, including from other potential jurors that day. Defense counsel did not object to this approach and did not request dismissal of the entire jury pool. The trial court continued *voir dire* and queried:

> I'm going to ask a more general question and that is whether any of you believe you have heard about this case from a less formal source than maybe the media, read about it on Facebook, somebody talked about it at work, you heard the comments of a fellow juror member here today such that you believe—what you have heard about this case has caused you to believe that you cannot decide the case based on the evidence and the law? Specifically, you may have heard something about it, but do you have the ability to set that aside and wait to hear the evidence, wait to be instructed by the Court on the law, wait to deliberate with your fellow jurors and arrive at a fair verdict? Is there anyone who believes they can't based on what they've heard?

(**Id.** at 19). None of the venirepersons answered in the affirmative except for one who had previously raised an issue.

**B.**

During the four-day jury trial, several former employees of the Daycare, including Tasha Shetter (Shetter), Jane Auchmoody (Auchmoody), Rachel Bricker (Bricker), Jacquelyn Miller (Miller) and Madison Platter (Platter) testified to the purported abuse suffered by each of the children for which charges were brought. Many of the witnesses have backgrounds in early childhood education and testified regarding Nolan's inappropriate treatment of those children at the Daycare.

Ms. Shetter testified that she began working full-time at the Daycare in October 2019 and was hired as a head teacher for the one-year-olds. During nap time, which typically lasted three hours, three or four-year-old A.R. was brought back to Shetter's room and put in the bucket seats, although most of the children slept on mats. These seats were generally used at mealtimes and Shetter described them as "tables with little buckets inside of them that you buckled the children in, so if they weren't able to sit up correctly or were younger . . . [the seats] made it easier for them to sit up correctly to eat[.]" (N.T. Trial, 11/29/21, at 148).

Shetter recounted an incident where A.R. was in a bucket seat and "I was told that she had misbehaved, and she was in time-out, and was in there for at least an hour after I had gotten there, and I mentioned she had marks. And at that point she was taken out of them." (*Id.* at 156). Shetter explained A.R. had marks "from the seats because they are not meant for someone her age." (*Id.*). Although the room was mostly quiet, "[A.R.] was kicking and screaming . . . [because] those seats in general were way too small for her . . . [and her] feet touched the ground [and] she could actually drag one of her feet across the floor." (*Id.* at 158-59). Shetter recounted that she could hear Nolan "every day though my two doors I could hear her screaming at [A.R.] [. . . saying:] 'I don't know why you can't listen to me you stupid son of a gun—or other curse words[.]'" (*Id.* at 162-63). Shetter testified that Nolan

routinely verbally attacked A.R. and sent her to the one-year-old room for nap time because she considered her a nuisance. (*See id.* at 163).

Ms. Auchmoody testified that Nolan hired her as director of the Daycare in September 2018 and that she had previously operated her own in-home daycare business. Auchmoody recalled that Nolan would yell at A.R. frequently and put her in the one-year-old room at nap time in the bucket seats. (*See id.* at 196). In one instance, Auchmoody asked Nolan if she could switch rooms so that she could put A.R. on a mat and attempt to get her to sleep, but Nolan refused. (*See id.* at 197-98; 220, 223). Auchmoody explained that bucket seats are typically used in daycare settings for eating or for a defined activity, and that state regulations provide for their use by children ages five to 24 months. However, in A.R.'s case, her feet were touching the floor and "that's going to do harm to the child. So that's endangerment [and] trapping a child." (*Id.* at 221).

Auchmoody testified that in her experience in the daycare business, she rewarded the children's good behavior with a sticker or some similar item. When she attempted to implement a rewards system at the Daycare, Nolan instructed her not to do so because "kids were born to behave." (*Id.* at 199). She recalled that Nolan "would always yell" and that she yelled at W.M. very loudly. (*Id.* at 200). Auchmoody described C.H. as autistic and explained that C.H. had a tic where she "liked to flap" by moving her hands back and forth at the wrist. (*Id.* at 201). Nolan sometimes withheld snacks from the

children as a group as punishment for what she perceived as bad behavior. When this happened, Auchmoody disregarded Nolan's instructions and gave snacks to the children anyway, as she wanted to comply with state regulations. (*See id.* at 227-29).

Ms. Bricker testified that she is a second-grade teacher and that she worked at the Daycare for about three weeks in the fall of 2018 on a part-time basis, primarily with toddlers. Bricker relayed that A.R. was placed in the toddler room rather than in the preschool room because she was non-verbal and had developmental delays. (*See* N.T. Trial, 11/30/21, at 16-17). Bricker described A.R. as a normal young child who "wanted to get into toys, wanted to play with things" but that this was not an option because she was "confined typically in one of those bucket seats" with straps around her waist. (*Id.* at 17). The bucket seats were positioned around tables and A.R. was so tall that her legs did not hang and dangle from the seat, but instead dragged back and forth on the floor. (*See id.* at 25-26).

Nolan also placed one-year-old J.M. in the bucket seats often and referred to him as autistic although he was too young for a formal diagnosis. (*See id.* at 18-19). Bricker explained that the bucket seats were used as a form of discipline and that the children would be strapped into the bucket seats for prolonged periods of time with no projects or activities put in front of them. (*See id.* at 19-20). When Bricker was alone with the children, she removed them from the bucket seats to play and interact with them. J.M. was

placed in the bucket seat frequently during nap time and for behaving "out of control trying to play with things all over the place." (***Id.*** at 24). Bricker recalled that Nolan also routinely yelled at W.M., who was about three years old, for not sitting still and that she could hear the yelling "often and in [] a loud, raised voice." (***Id.*** at 27-28).

Bricker testified that C.H. was placed in the toddler room even though she was about three years old because she was non-verbal and Nolan "deemed [her] autistic as well." (***Id.*** at 30). Because C.H. needed a lot of assistance with the bathroom and had developmental delays, Nolan "preferred her to be in the back [toddler room] so she did not have to interact with her." (***Id.*** at 31). Bricker also relayed that Nolan withheld snacks from the children as a form of punishment for not cleaning up or for "being out of control." (***Id.*** at 36).

Ms. Miller testified that she worked at the Daycare in the fall of 2018 for less than one month while she was a college student majoring in early childhood and special education. She worked as an aide and floated between the different age groups. Miller recalled that A.R. was frequently placed with the younger children instead of with her own age group and she had observed marks in the middle of A.R.'s back near her spine that looked like scratches. When Miller asked about these marks, Nolan blamed her for causing them. (***See id.*** at 65-69). Miller recounted an instance when, during nap time, J.M. was rolling around on his mat and she tried to comfort him by patting his back.

When Nolan saw that J.M. was awake, she "grabbed him and put him into the bucket seats and said 'this is going to help him fall asleep; this is where he sleeps.' And then she buckled him in [and] he cried, kicked for about five to ten minutes . . . [then] fell asleep." (*Id.* at 70-71).

Regarding her last day at the daycare, Miller testified that the children had been sitting down since 7:00 a.m. with no physical activity. When W.M. got out of his seat at about 9:00 a.m., Nolan grabbed him by the arms from behind and said "Why can't you listen? You should be sitting down, and threw him into this chair." (*Id.* at 80). Miller recounted that she could hear W.M.'s body hit the chair as Nolan continued to hold him by the side of his arms and yell loudly at him in front of the other children. Nolan then "started shaking him, and all you could see was his head go back and forth, probably three, four times, going back and forth still shaking him saying 'Why can't you listen?'" (*Id.*). Miller relayed that when Nolan stopped shaking W.M., he looked very frightened and started crying immediately. When Nolan walked away, Miller ran to him to comfort him. Miller quit her job because of "how [Nolan] treated the kids and seeing [W.M.], how she physically put her hands on him — I just couldn't do it anymore." (*Id.* at 90-91). Miller testified that she contacted police out of concern for the children's safety. (*See id.* at 93-94).

Ms. Platter testified that she worked at the Daycare part-time in the fall of 2018 as an assistant teacher while she was a sophomore in college majoring

in early childhood and special education. Platter recalled that A.R. had trouble remaining still at nap time and "was placed back on her mat aggressively multiple times by Linda Nolan." (*Id.* at 113-14). Nolan also sent A.R. to the toddler room frequently to be put in the bucket seats for discipline for up to four hours throughout the day. Nolan would strap A.R. into the seat with the belt and angrily "tell her she was bad, that she needed to learn how to act." (*Id.* at 118-19). Platter testified that A.R. was too tall for the bucket seats and that when Platter tried to take her out of it, Nolan directed her not to. (*See id.* at 141).

Platter recalled that Nolan often yelled at W.M. when he rocked or scooted his chair and told him that "he was bad and that he didn't know how to act." (*Id.* at 131). Regarding J.M., Platter testified to one instance where he "was left in a bucket seat [by Nolan] all day from the beginning of my shift until the end of it" when she worked a ten-hour shift. (*Id.* at 133). When Nolan left the room, Platter removed J.M. from the seat to let him move around. Platter testified that J.M. "was too big for the bucket seat . . . the plastic of the bucket seat would [] poke him so he would move around, he would cry, he would scream until he just kind of gave up, and then he would just sit there." (*Id.* at 139). J.M. would not be given a toy or book to play with until it was close to the time when his mother was scheduled to pick him up.

C.H. was deemed autistic and was moved between the preschool, toddler and infant rooms because of her tics and tendency to move her hands back and forth in a flapping motion. C.H. would be placed in a highchair with her "arms at her side and the tray [] over them so she would be hitting the bottom of the tray instead of flapping out." (*Id.* at 144). Platter explained that the incident with W.M. served as the impetus for several employees to quit the Daycare and recounted that W.M. would not sit in his chair anymore while the rest of the children were seated in the preschool room. (*See id.* at 146). When W.M. started wiggling in his chair, Nolan grabbed the back of his chair, pulled it out, "grabbed him by the upper arms and slammed him back down into the chair and started shaking him so his head was going back and forth, and she was in his face the whole time yelling at him that he was bad and needed to listen . . . and then she grabbed the back of his chair and slammed his chair back into the table with him in it." (*Id.* at 147-48). Platter recalled that W.M. started crying immediately and looked terrified. She quit her job because she did not feel comfortable and "was concerned specifically about the welfare of the children[.]" (*Id.* at 151).

## C.

On December 2, 2021, the jury found Nolan guilty of four counts of EWOC. The trial court sentenced Nolan in March 2022 to an aggregate term of 60 months' probation. Nolan filed a post-sentence motion challenging the sufficiency of the evidence and the impartiality of the jury pool based on the

comments of Juror #131, which the trial court denied by order and opinion entered June 28, 2022. In doing so, the trial court detailed the voluminous testimony presented at trial as it related to W.M., C.H., A.R. and J.M. and concluded that the evidence was sufficient to establish that Nolan had endangered their physical, psychological and emotional welfare, thereby violating her duty of care. (*See* Trial Court Opinion, 6/28/22, at 35-46). The court found that "a daycare provider who voluntarily assumes the responsibility of caring for young children should have better ways of handling [the children's] behavior," that her methods were not appropriate for their age or level of understanding, and that her actions crossed the line from discipline to conduct harmful to their well-being. (*Id.* at 45-46). As to the issue concerning Juror #131, the trial court determined that it acted within its discretion in declining to dismiss the entire jury pool, and that it appropriately addressed the remarks by immediately dismissing her and conducting a thorough *voir dire* of the remaining venirepersons. (*See id.* at 49-50). Nolan timely appealed and she and the trial court complied with Rule 1925. *See* Pa.R.A.P. 1925(a)-(b).

**II.**

Nolan first contends the evidence was insufficient[3] to sustain her EWOC convictions as to W.M., C.H., A.R. and J.M.  Nolan maintains that her conduct did not rise to the level of EWOC where the testimony presented consisted primarily of allegations that she "yell[ed] and stop[ed] the children's movement."   (Nolan's Brief, at 9).   Nolan claims the Commonwealth's witnesses "exaggerated or fabricated testimony" because they did not agree with her methods, that she violated no duty concerning the children, and that even if the allegations are true, they amount only to "disciplinary or safety actions."  (*Id.* at 10, 13).

Our Crimes Code defines the offense of EWOC as follows:  "A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an

_____

[3]    A challenge to the sufficiency of the evidence presents a question of law and is subject to plenary review.  In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder.  The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.  The factfinder is free to believe all, part, or none of the evidence presented.

*Commonwealth v. Vela-Garret*, 251 A.3d 811, 815 (Pa. Super. 2021) (citations omitted).

offense if [she] knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S. § 4304(a)(1). The phrase "person supervising the welfare of a child" means a person "other than a parent or guardian that provides care, education, training or control of a child." *Id.* at (a)(3). To convict a defendant of EWOC, the Commonwealth must establish that she is aware of her duty to protect the child; is aware that the child is in circumstances that could threaten the child's physical or psychological welfare; and has either failed to act or has acted so weak that such actions cannot reasonably be expected to protect the child's welfare. *See Vela-Garrett*, *supra* at 815.

In considering the circumstances of this case, we are mindful that child welfare statutes such as EWOC are designed to cover a broad range of conduct in order to safeguard the welfare and security of children. *See Commonwealth v. Krock*, 282 A.3d 1132, 1137 (Pa. Super. 2022). In evaluating whether an individual's conduct violates Section 4304, "the common sense of the community, as well as the sense of decency, propriety, and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it." *Id.* (citation omitted). Additionally, the EWOC statute does not require the actual infliction of physical injury or include a requirement that the child be in imminent threat of physical harm. *See id.* at 1139. The terms of the statute are "necessarily drawn broadly to capture conduct that . . .

involves the endangering of the physical or moral welfare of a child by an act or omission in violation of a legal duty." ***Commonwealth v. Lynn***, 114 A.3d 796, 819 (Pa. 2015) (citation omitted). Additionally, the language employed as to endangerment of a child's welfare and a person's duty of care to that child are not esoteric and are instead "easily understood and given context by the community at large." ***Id.*** at 818 (citation omitted).

In this case, the trial court rejected Nolan's sufficiency claim, stating:

> The evidence presented to the jury in its entirety revealed a clear pattern of mistreatment towards some of the children Defendant was trusted (and paid) to care for. The evidence showed that Defendant berated and talked down to the children, deprived them of stimulation, activity and play essential to their healthy growth and development . . . and imposed punishment excessive in both frequency and duration and inappropriate for the children's age and development.

(Trial Ct. Op., at 34).

The trial court went on to detail Nolan's treatment of W.M., C.H., A.R. and J.M. in the context of its finding that she violated the duty of care she owed to each child:

> [Nolan's] conduct in grabbing [W.M.] from behind without warning, throwing or slamming him into a chair hard enough to make noise, grabbing him and shaking him so that his head was being jerked back and forth, and slamming his chair, while he was in it, back into the table until it made contact with his stomach clearly threatened W.M.'s physical well-being. The reaction of the other employees to this incident at that time speaks volumes about the harm they felt was present upon what they saw. Specifically, Miller, Auchmoody, Platter and [Bricker] all abruptly quit their jobs at Miracle Bush that day[.] . . .
>
> In addition to any physical danger, the employees also testified about the psychological effect this incident had on W.M.

Platter described him as visibly terrified and said he started crying immediately. Miller corroborated Platter's account, explaining that when Defendant stopped shaking him, W.M. started crying and looked frightened. While several employees immediately ran up to W.M. to ask him if he was okay and comforted and hugged him, Defendant merely walked away like nothing happened. . . .

[Regarding C.H.] although it was clear she exhibited tics [consistent with an autism spectrum disorder] involuntarily and as a calming mechanism, Defendant took deliberate actions to prevent her from doing so. When C.H. engaged in flapping, [Nolan] removed her to another room and put her in a highchair with her arms at her side, under her highchair's tray, so she could not flap. The employees believed that Defendant deliberately used the highchair instead of a bucket seat because C.H.'s arms would not be restrained in a bucket seat. . . . C.H. was often removed from the classroom with children her age and put in the room for younger children by Defendant because C.H. was nonverbal and needed more assistance and Defendant did not want to interact with her or give her assistance. When she did interact with C.H., witnesses saw Defendant yell at C.H. for not following directions or processing things as quickly, due to her developmental delays. Employees saw C.H. become visibly upset, crying and making fussy noises, in response to Defendant yelling at her.

. . . There was sufficient evidence demonstrating that Defendant knowingly placed A.R. in circumstances that threatened her physical and/or psychological welfare. A.R. was a three-or four-year-old girl who should have been in the classroom with children her age, but was instead frequently moved to the one-year-old classroom because she was non-verbal, and had some developmental delays. . . . Witnesses stated A.R. was kept in bucket seats at times when all the other children were allowed to nap; they testified to her kicking and screaming while in the bucket seats. . . . A.R. was kept in the bucket seats for so long she developed marks on her body from the seats.

Though too young for a formal diagnosis, Defendant referred to J.M. as "autistic." J.M. was too big for the bucket seats, but he was repeatedly forced to sit in them for long periods of time without any activity or breaks. J.M. was strapped into the bucket seat so he could not get out. Defendant also prevented other employees from removing J.M. by using intimidation to

ensure compliance. Defendant withheld toys, coloring books, and activities from J.M. during the hours-long periods he was restrained in bucket seats. The evidence shows this depravation was methodical and planned, as Defendant would specifically instruct other employees to put a toy in front of J.M. fifteen minutes before his parents were scheduled to pick him up. . . . J.M. was punished almost daily for moving around and trying to get into the toys and exploring like young children do. He was frequently retrained and isolated in a bucket seat while the other children were allowed to play, for hours and hours at a time.

(*Id.* at 36-39, 42-44, 46).

Based on the foregoing and our independent review of the extensive record in this case, and mindful of the precept that the EWOC statute covers a broad range of conduct in order to safeguard the welfare and security of children, we conclude that Nolan's conduct concerning these four children while acting in her supervisory role as caregiver at the Daycare amounted to criminal behavior. Contrary to Nolan's self-serving characterization of the testimony, her actions constituted much more than discipline and were so extreme as to be flagrantly contrary to the "common sense of the community, as well as the sense of decency, propriety, and the morality which most people entertain[.]" *Krock*, *supra* at 1137 (citation omitted). Nolan had a clear duty to provide care, protection and support for the children entrusted to her care by their parents, and she abdicated that responsibility by verbally berating them and physically restraining them for inordinate amounts of time as punishment. Her mistreatment of the children escalated when she thew W.M. into a chair and visibly shook him in front of his peers and caregivers, prompting police intervention. To the extent that Nolan challenges the

veracity of the testimony of the Daycare's former employees, the jury as factfinder was free to credit their testimony in weighing the evidence presented. **See Vela-Garret**, **supra** at 815. Nolan's first issue merits no relief.

### III.

Nolan next contends the trial court erred in failing to dismiss the entire jury pool after Juror #131 made remarks during *voir dire* indicating that she had "inside information" regarding Nolan's guilt from her apparent work at another daycare center. (Nolan's Brief, at 13-14). Nolan claims that a new trial is warranted because these comments likely tainted the remaining juror's views, and the remedial action taken by the court was insufficient to cure any prejudice. (**See id.** at 15-16).[4]

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a defendant the right to an impartial jury, and the jury selection process is crucial to the preservation of that constitutional right. **See Davis**, **supra** at 1239. Thus, the trial court has an obligation to remove prospective jurors who are unable to impartially follow its instructions and evaluate the evidence presented, and "the purpose of *voir dire* is solely to ensure the

---

[4] The scope of *voir dire* is within the sound discretion of the trial court. **See Commonwealth v. Davis**, 273 A.3d 1228, 1239 (Pa. Super. 2022). In reviewing a trial court's ruling on a challenge to the empaneling of a jury, "we employ a standard of review which affords great deference to the trial judge." **Id.** (citation omitted).

empaneling of a competent, fair, impartial, and unprejudiced jury capable of following the instructions of the trial court." *Id.* at 1239-40 (citation omitted). However, "[e]ven [a juror's] exposure to outside information does not ineluctably mean that a jury is unfair and partial." ***Commonwealth v. Williams***, 220 A.3d 1086, 1092–93 (Pa. Super. 2019), *appeal denied*, 230 A.3d 1022 (Pa. 2020) (citation omitted).

In this case, the trial court ensured the jury's impartiality and fairness by immediately dismissing the juror who indicated that she could not remain impartial and by extensively questioning the remaining venirepersons to determine their ability to proceed. The statements made by Juror #131 did not disclose any actual information about Nolan or the potential evidence in this case, as the trial court quickly intervened to stop her from speaking. Given that the purpose of jury selection is to identify the venirepersons' potential biases, vague references to outside knowledge is not so prejudicial as to render the entire jury pool tainted or incapable of remaining fair and impartial. The trial court questioned the remaining jurors at length to ensure that they could decide the case fairly based on the evidence presented in court, even in the event that they had heard outside information about the case. Nolan's final issue merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 02/02/2023